# WATT, SECRETARY OF THE INTERIOR, ET AL. *v.* ENERGY ACTION EDUCATIONAL FOUNDATION ET AL.

No. 80–1464.   Argued October 5, 1981—Decided December 1, 1981

O'CONNOR, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Claiborne* argued the cause for petitioners.   With him on the briefs were *Solicitor General Lee,* former *Solicitor General McCree, Assistant Attorney*

*General Dinkins, Harriet S. Shaprio, Anne S. Almy, Edward J. Schawaker,* and *Bruce C. Rashkow.*

*John Silard* argued the cause for respondents. With him on the brief was *Joseph L. Rauh, Jr.**

JUSTICE O'CONNOR delivered the opinion of the Court.

We are asked to review a decision of the United States Court of Appeals for the District of Columbia Circuit compelling the Secretary of the Interior to experiment with the use of certain statutorily defined bidding systems in awarding leases for oil and gas exploration and development on the Outer Continental Shelf. Because the decision below incorrectly construes the Outer Continental Shelf Lands Act Amendments of 1978, 92 Stat. 629, 43 U. S. C. § 1331 *et seq.* (1976 ed. and Supp. III), we reverse.

I

The Outer Continental Shelf Lands Act of 1953 (OCS Lands Act), 67 Stat. 462, as amended, 92 Stat. 629, 43 U. S. C. § 1331 *et seq.* (1976 ed. and Supp. III), authorizes the Secretary of the Interior to lease tracts of the Outer Continental Shelf (OCS)[1] for the exploration and development of mineral resources, including oil and gas. As originally passed, the OCS Lands Act authorized the Secretary to solicit sealed bids either by fixing a royalty rate of not less than 12½%, and requiring bids on the amount of an initial "cash bonus" to be paid at the time the lease was awarded, or by

*E. Edward Bruce* filed a brief for Atlantic Richfield Co. et al. as *amici curiae* urging reversal.

[1] The Outer Continental Shelf is defined by statute to mean "all submerged lands lying seaward and outside of the area of lands beneath navigable waters . . . and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 43 U. S. C. § 1331(a). The term "lands beneath navigable waters" is itself given an extensive definition in 43 U. S. C. § 1301, but generally means the undersea lands within three miles of the coastline.

fixing the amount of the cash bonus, and requiring bids on the royalty rate. 43 U. S. C. § 1337(a). The OCS Lands Act vested complete discretion in the Secretary to choose between these two bidding systems. In practice, prior to 1978 virtually all tracts were leased on the basis of a fixed royalty of $16^2/_3\%$ of the gross value of production, with bidding on the amount of the cash bonus. See H. R. Rep. No. 95–590, p. 138 (1977); S. Rep. No. 95–284, p. 72 (1977).

During the mid-1970's, the Nation's increasing dependence on imported oil focused public attention on the OCS as a potential source of domestic petroleum and natural gas. See H. R. Rep. No. 95–590, *supra,* at 53–54. At the same time, the traditional OCS bidding procedures came under close scrutiny because dramatic increases in petroleum prices made existing cash bonuses seem miserly relative to the revenues generated from wells on OCS leaseholds. Members of Congress began to express reservations about the ability of the traditional cash bonus, fixed royalty system to assure a fair return to the Government, principally because it appeared that only the major oil companies could risk paying a large cash bonus to lease a tract of unknown value. Because the number of bidders was often limited to a handful of giant concerns, competition for the leases seemed tepid, and there was no assurance that the ultimate return to the Government was adequate. See, *e. g., id.,* at 47, 54.

Responding to these and other pressures for modernization of the OCS Lands Act, Congress passed the Outer Continental Shelf Lands Act Amendments of 1978 (1978 Amendments), Pub. L. 95–372, 92 Stat. 629.[2] Through the 1978 Amendments, Congress sought to experiment with alternatives to the traditional bidding system. To this end, it in-

---

[2] The "basic purpose" of the 1978 Amendments was to "promote the swift, orderly and efficient exploitation of our almost untapped domestic oil and gas resources in the Outer Continental Shelf," H. R. Rep. No. 95–590, p. 53 (1977), and the Amendments were broadly designed to achieve that aim. We are concerned here, however, only with those provisions of the 1978 Amendments having to do with bidding systems for OCS leases.

creased the number of authorized bidding systems from 2 to 10, 43 U. S. C. § 1337(a)(1) (1976 ed., Supp. III), and directed the Secretary of the Interior to develop a 5-year plan of experimentation with the new systems. §§ 1337(a)(5)(B), 1344. Four of the newly authorized systems use a cash bonus bid (including the cash bonus, fixed royalty system, which was specifically retained in § 1337(a)(1)(A)),[3] three use a royalty rate bid,[4] one uses a "profit-share" bid,[5] and two use a "work-commitment" bid.[6]

Although the 1978 Amendments, like the original OCS

---

[3] Title 43 U. S. C. § 1337(a)(1) (1976 ed., Supp. III) authorizes: (1) a "cash bonus bid with a royalty at not less than $12\frac{1}{2}$ per centum fixed by the Secretary in amount or value of the production saved, removed, or sold," § 1337(a)(1)(A); (2) a "cash bonus bid . . . and a diminishing or sliding royalty based on such formulae as the Secretary shall determine as equitable to encourage continued production from the lease area as resources diminish, but not less than $12\frac{1}{2}$ per centum at the beginning of the lease period in amount or value of the production saved, removed, or sold," § 1337(a)(1)(C); (3) a "cash bonus bid with a fixed share of the net profits of no less than 30 per centum to be derived from the production of oil and gas from the lease area," § 1337(a)(1)(D); and (4) a "cash bonus bid with a royalty at no less than $12\frac{1}{2}$ per centum fixed by the Secretary in amount or value of the production saved, removed, or sold and a fixed per centum share of net profits of no less than 30 per centum to be derived from the production of oil and gas from the lease area," § 1337(a)(1)(F).

[4] Section 1337(a)(1)(B) authorizes: a "variable royalty bid based on a per centum in amount or value of the production saved, removed, or sold, with either [1] a fixed work commitment based on dollar amount for exploration or [2] a fixed cash bonus as determined by the Secretary, or [3] both."

[5] Section 1337(a)(1)(E) authorizes a "fixed cash bonus with the net profit share reserved as the bid variable."

[6] Section 1337(a)(1) authorizes: (1) a "work commitment bid based on a dollar amount for exploration with a fixed cash bonus, and a diminishing or sliding scale royalty based on such formulae as the Secretary shall determine as equitable to encourage continued production from the lease area as resources diminish, but not less than $12\frac{1}{2}$ per centum at the beginning of the lease period in amount or value of the production saved, removed, or sold," § 1337(a)(1)(C); and (2) a "work commitment bid based on a dollar amount for exploration with a fixed cash bonus and a fixed royalty in amount or value of the production saved, removed, or sold," § 1337(a)(1)(G).

Lands Act, give the Secretary of the Interior the discretion to select among the various authorized bidding systems, that discretion is no longer total. The statute now requires the Secretary to experiment with the nine nontraditional systems in "not less than 20 per centum and not more than 60 per centum of the total area offered for leasing each year," § 1337(a)(5)(B), unless he determines that those percentage requirements are "inconsistent with the purposes and policies" of the 1978 Amendments.[7]

The 1978 Amendments assure ongoing congressional oversight of the Secretary of the Interior's leasing activities by requiring frequent reports to Congress on the operation of the bidding systems. For example, the Secretary of Energy, who has responsibility for issuing regulations governing OCS bidding,[8] must report within six months of the end of each fiscal year "with respect to the use of [the] various bidding options," including, "if applicable, the reasons why a particular bidding system has not been or will not be utilized." § 1337(a)(9). In addition, the Secretary of the Interior must submit each fiscal year a report that includes "an evaluation of the competitive bidding systems permitted under [the 1978 Amendments], and, if applicable, the reasons why a particular bidding system has not been utilized," as well as "an evaluation of alternative bidding systems not per-

---

[7] Section 1337(a)(9)(E) requires that his determination be explained to Congress.

[8] Under the 1978 Amendments, the Secretaries of the Interior and of Energy work together on the OCS leasing program. Competitive bidding for OCS leases is to be carried out pursuant to "regulations promulgated in advance," § 1337(a)(1), and the Department of Energy Organization Act, 42 U. S. C. §§ 7152(b), 7153 (1976 ed., Supp. III), gives the Secretary of Energy the responsibility for issuing such regulations in consultation with the Secretary of the Interior. The Secretary of Energy also has authority to develop bidding systems other than the 10 specifically enumerated in § 1337(a)(1), provided any new system has no more than one bidding variable and is not disapproved by Congress. §§ 1337(a)(1)(H), (a)(4)(A).

mitted under [the 1978 Amendments], and why such system or systems should or should not be utilized." §§ 1343(2)(A) and (B).

To date, the Secretary of Energy has issued regulations for a number of the bidding systems, including three of the four systems using cash bonus bidding, 10 CFR §§ 375, 376 (1981) (the cash bonus bid, fixed royalty system and the cash bonus bid, fixed sliding-scale royalty system); §§ 376, 390 (the cash bonus bid, fixed net profit-share system), as well as the royalty bid, fixed cash bonus system, §§ 375, 376, the net profit-share bid, fixed cash bonus system, §§ 376, 390, and the work-commitment bid, fixed cash bonus and fixed royalty system, 46 Fed. Reg. 35614 (1981) (to be codified in 10 CFR §§ 376, 390). For his part, the Secretary of the Interior has prepared a 5-year program for the period from June 1980 to May 1985, calling for 36 sales, each involving a number of tracts. Brief for Petitioners 7. The Secretary of the Interior has so far used the nontraditional bidding systems in leases covering 49% of the total area offered, but has experimented with only two of the nine authorized alternative bidding systems: the cash bonus bid, fixed profit-share system, and the cash bonus bid, fixed sliding-scale royalty system. *Id.*, at 8, and n. 12. The Secretary of the Interior has not experimented, however, with *any* of the systems using a factor other than the size of a cash bonus as the bidding variable.[9]

---

[9] During the course of the present litigation, the Secretary of the Interior filed an affidavit with the District Court stating that he does not intend to use either profit-share or work-commitment bidding because he does "not believe the purposes of the OCS Lands Act or the best interests of the nation would be served by the use" of either system. Affidavit of James G. Watt, Secretary of the Interior, *Energy Action Educational Foundation* v. *Watt*, No. 79–1633 (DC) (sworn May 8, 1981), reprinted in App. to Brief for Respondents 2a–3a. The Department of the Interior is on record as disfavoring royalty-share bidding as well. See *Energy Action Educational Foundation* v. *Andrus*, 210 U. S. App. D. C. 20, 28, and n. 44, 654 F. 2d 735, 743, and n. 44 (1980).

158

II

This litigation grows out of the Secretary of the Interior's continued reliance on cash bonus bidding systems. The respondents here, nine consumer groups, two state governmental entities, and three private citizens, brought suit against the United States, the Secretary of the Interior and the Secretary of Energy, alleging that the Secretaries had abused their discretion by failing to experiment with bidding systems that do not use the size of a cash bonus as the bidding variable. In essence, they complained that bonus bidding cannot generate adequate competition to yield a fair market return for OCS oil and gas as required by the 1978 Amendments. They sought declaratory and injunctive relief prohibiting further lease sales until the Secretary of Energy promulgated regulations for each of the alternative bidding systems, and prohibiting the further use of the cash bonus, low royalty bidding systems.

---

As reported to Congress, the bidding systems used during fiscal years 1978 through 1980 were as follows. In fiscal year 1978, three lease sales were held, with 218 tracts leased. Of those, 30 tracts were leased under the fixed cash bonus, royalty bid system, 41 under the cash bonus bid, sliding-scale royalty system, and the remainder under the traditional cash bonus bid, fixed 16⅔% royalty system. Department of the Interior, OCS Oil and Gas Leasing: An Annual Report on the Leasing and Production Program, Fiscal Year 1978. In fiscal year 1979, five lease sales were held, with 290 tracts leased. Of those, 161 were leased under the traditional cash bonus bid, 16⅔% royalty system, and 129 under the cash bonus bid, sliding-scale royalty system. Department of the Interior, OCS Oil and Gas Leasing: An Annual Report on the Leasing and Production Program, Fiscal Year 1979. In fiscal year 1980, four lease sales were held, with 293 tracts leased. Of those, 136 tracts were leased under the traditional cash bonus bid, 16⅔% royalty system, 120 under the cash bonus bid, sliding-scale royalty system, 23 under the cash bonus bid, fixed net profit-share system, and 14 under a cash bonus bid, fixed 33⅓% royalty system. Department of the Interior, Outer Continental Shelf Oil and Gas Leasing and Production Program, Annual Report, Fiscal Year 1980.

Three days after they filed suit and four days before a planned lease sale, the respondents filed a motion for a preliminary injunction barring all further lease sales until regulations had been promulgated for each of the bidding options contained in the 1978 Amendments. The District Court denied the motion because the respondents had not shown a likelihood of prevailing on the merits, and because the pace at which the Secretary of Energy was issuing regulations was not unlawfully slow in light of the complexity involved in preparing such regulations.[10] The Court of Appeals affirmed the District Court's ruling and remanded the case for further proceedings. *Energy Action Educational Foundation* v. *Andrus*, 203 U. S. App. D. C. 169, 631 F. 2d 751 (1979).

On remand, both parties moved for summary judgment, and the respondents renewed their motion for a preliminary injunction barring future lease sales until additional bidding system regulations had been issued. The District Court denied all motions for summary judgment as well as the respondents' motion for a preliminary injunction, 516 F. Supp. 90 (DC 1980), and the respondents once more appealed.

This time, the Court of Appeals affirmed the District Court only to the extent that it refused to enjoin lease sales scheduled for September, October, and November 1980. Turning to the underlying dispute, the court concluded both that the 1978 Amendments require the Secretary of the Interior to experiment with at least some of the bidding systems that do not use the size of a cash bonus as the bidding variable, and that the Secretary of Energy must issue appropriate regulations for the alternative bidding systems.[11] *Energy Action*

---

[10] 479 F. Supp. 62 (DC 1979).

[11] On remand to the District Court, the parties stipulated to the entry of an order requiring the Department of Energy to issue final regulations for the net profit-share bid, fixed cash bonus system and the work-commitment bid, fixed cash bonus and fixed royalty system. Brief for Petitioners 9; Brief for Respondents 5, n. 1; see also 46 Fed. Reg. 35614, 35615 (1981) (to be codified in 10 CFR §§ 376, 390). Thus, no question is now presented

*Educational Foundation* v. *Andrus,* 210 U. S. App. D. C. 20, 654 F. 2d 735 (1980).

We granted the Government's petition for certiorari to review this construction of the 1978 Amendments. 450 U. S. 1040.

## III

Before examining the merits, we must consider the petitioners' contention that the respondents do not have standing to challenge the Secretary of the Interior's choice of bidding systems.

There are three groups of plaintiffs in this litigation: (1) the State of California, which claims standing as an involuntary "partner" with the Federal Government in the leasing of OCS tracts in which the underlying pool of gas and oil lies under both the OCS and the 3-mile coastal belt controlled by California; (2) California and the city of Long Beach, which compete with the Federal Government in the leasing of off-shore oil and gas properties; and (3) consumers of oil and gas and of oil- and gas-derived products.[12] Because we find California has standing, we do not consider the standing of the other plaintiffs. See *Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U. S. 252, 264, and n. 9 (1977); *Buckley* v. *Valeo,* 424 U. S. 1, 12 (1976) *(per curiam).*

The 1978 Amendments require the Federal Government to turn over a fair share of the revenues of an OCS lease to the neighboring coastal State whenever the Federal Government and the State own adjoining portions of an OCS oil and gas

---

concerning the Secretary of Energy's duty to issue these regulations. The Court of Appeals and the respondents based their conclusion that the Secretary of Energy must issue regulations for the alternative systems on the theory that the Secretary of the Interior must use them, the issue under consideration here.

[12] In their initial complaint, the individual respondents also claimed standing as taxpayers, but have not pressed that claim here. The 1978 Amendments contain a provision which permits suit by those having "a valid legal interest." § 1349(a)(1).

pool.    See 43 U. S. C. § 1337(g)(4) (1976 ed., Supp. III).
California thus has a direct financial stake in federal OCS
leasing off the California coast.    In alleging that the bidding
systems currently used by the Secretary of the Interior are
incapable of producing a fair market return, California clearly
asserts the kind of "distinct and palpable injury," *Warth* v.
*Seldin*, 422 U. S. 490, 501 (1975), that is required for
standing.

To demonstrate that it has standing, however, California
must also show that there is a "fairly traceable" causal con-
nection between the injury it claims and the conduct it chal-
lenges, *Arlington Heights* v. *Metropolitan Housing Develop-
ment Corp.*, *supra*, at 261, so that if the relief sought is
granted, the injury will be redressed, *Simon* v. *Eastern Ky.
Welfare Rights Org.*, 426 U. S. 26, 41–46 (1976).    The peti-
tioners argue that the relief California seeks—experimental
use on some OCS lease tracts of non-cash-bonus bidding sys-
tems—will not ensure that the Secretary will try these sys-
tems on parcels leased off the California coast.    According to
the petitioners, even if California were to win its suit, cash
bonus systems might nevertheless still be used to lease tracts
overlying California's pools.    The petitioners assert that
California therefore lacks standing because it has failed to
show that the relief requested would cause the Secretary of
the Interior to use non-cash-bonus bidding systems on Cali-
fornia's parcels.

The essence of California's complaint, however, is that the
Secretary of the Interior, by failing to test non-cash-bonus
systems, has breached a statutory obligation to determine
through experiment which bidding system works best.    Ac-
cording to California, only by testing non-cash-bonus systems
can the Secretary of the Interior carry out his duty to use the
best bidding systems and thereby assure California a fair re-
turn for its resources.    The petitioners' argument, California
contends, improperly assumes that the Secretary of the Inte-
rior would perversely refuse to adopt a non-cash-bonus bid-

ding system proved by experiment to be superior to the cash bonus alternatives.

We share California's confidence that, after experimentation, the Secretary would use the most successful bidding system on all suitable OCS lease tracts, including those off the California coast. For this reason, we agree with California that it has standing to challenge the Secretary of the Interior's refusal to experiment with non-cash-bonus bidding systems. Therefore, we proceed to the merits.

## IV

In passing the 1978 Amendments, Congress committed the Government to the goal of obtaining fair market value for OCS oil and gas resources. The 1978 Amendments themselves proclaim this intention,[13] and the legislative history is replete with references to this purpose.[14] The respondents urge that non-cash-bonus bidding systems are more likely to achieve the statutory objectives than the cash bonus systems used to date, so that the Secretary of the Interior's continued reliance on cash bonus bidding violates the statutory scheme.

## A

We begin, as always in a case in which the meaning of a statute is at issue, by examining Congress' language. If Congress meant to restrain the Secretary of the Interior's discretion in experimenting with the various alternative bidding systems, we can expect the statute to reflect that intent. But it does not.

Despite the various reservations concerning the traditional cash bonus bidding system recorded in the legislative history

---

[13] Section 1344(a)(4) states that "[l]easing activities shall be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government."

[14] See, e. g., H. R. Rep. No. 95–590, pp. 47, 54 (1977); S. Rep. No. 95–284, pp. 46, 73 (1977).

of the 1978 Amendments, Congress not only failed to repudiate the traditional cash bonus, fixed royalty system specified in § 1337(a)(1)(A), but affirmatively directed that the Secretary of the Interior use that system in the bidding for tracts covering at least 40% of the total area leased in each year of the 5-year plan. § 1337(a)(5)(B). The only express limitation Congress put on the use of the traditional system was that it not be used on more than 80% of the total area offered each year. *Ibid.* In short, Congress can hardly be said to have rejected even the traditional cash bonus system. Moreover, among the experimental bidding alternatives listed in the 1978 Amendments, Congress expressly specified cash bonus as the bid variable in three systems.[15] Most significantly, Congress left to "the discretion of the Secretary," § 1337(a)(1), the choice among the various nontraditional alternatives, evidently leaving to his expert administrative determination the complex, technical problem of deciding which alternative bidding systems are more likely to further the statute's objectives. In addition, Congress granted the Secretary further discretion to abandon the statutory requirements for the percentage use of the nontraditional alternatives, should he determine that those requirements are inconsistent with the statutory purposes and policies. § 1337(a)(5)(B).

The respondents argue that the Secretary's discretion is limited by § 1344(a)(4), which directs that "[l]easing activities shall be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government." According to the respondents, the Secretary is violating § 1344(a)(4) by refusing to try non-cash-bonus bid-

---

[15] Those three are the cash bonus bid, diminishing or sliding-scale royalty system, § 1337(a)(1)(C), the cash bonus bid, fixed net profit-share system, § 1337(a)(1)(D), and the cash bonus bid, fixed royalty and fixed net profit-share system, § 1337(a)(1)(F).

ding, because cash bonus bidding allegedly does not assure that fair market value is received for the Government's resources.

Section 1344(a)(4) cannot support the weight the respondents attach to it. Section 1344 directs the Secretary of the Interior to "prepare and periodically revise, and maintain an oil and gas leasing program" consistent with the "principles" enumerated in §§ 1344(a)(1)–(4). The receipt of fair market value, the fourth listed principle, is only one of many general considerations commended to the Secretary's attention.[16] The section directs that the Secretary's entire leasing program be consistent with the principles enumerated. Yet elsewhere the statute requires the Secretary's program to use the traditional cash bonus, fixed royalty system on as

---

[16] Also included, for example, are the "economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf." § 1344(a)(1). In addition, the Conference Report indicates that providing a fair return to the Federal Government is only one of many considerations the Secretary of the Interior is to weigh:

"The conferees intend that in utilizing the new bidding alternatives, a variety of considerations should be taken into account, including but not limited to: (i) Providing a fair return to the Federal Government; (ii) increasing competition; (iii) assuring competent and safe operations; (iv) avoiding undue speculation; (v) avoiding unnecessary delays in exploration, development, and production; (vi) discovering and recovering oil and gas; (vii) developing new oil and gas resources in an efficient and timely manner; and (viii) limiting administrative burdens on government and industry." H. R. Conf. Rep. No. 95–1474, p. 92 (1978).

The House Report reiterates the point, emphasizing that striking the proper balance among the factors is up to the Secretary of the Interior:

"One purpose of [the 1978 Amendments] is to authorize alternative leasing arrangements and require experimentation with them. It will enable the Secretary of the Interior, who administers the federal leasing program, to strike a proper balance between securing a fair return to the Federal Government for the lease of its lands, increasing competition in exploitation of resources, and providing the incentive of a fair profit to the oil companies, which must risk their investment capital." H. R. Rep. No. 95–590, p. 54 (1977).

much as 80%, and on no less than 40%, of the acreage leased. § 1337(a)(5)(B). So Congress cannot have considered the traditional cash bonus system incapable of providing a fair market return, for that is the one system Congress required the Secretary to use. We therefore conclude that § 1344 (a)(4) cannot fairly be read to constrain indirectly the Secretary's discretion in choosing to use the alternative cash bonus bidding systems.

The only express statutory check on the Secretary of the Interior's discretion is the requirement that he periodically report to the Congress his reasons for failing to use any of the alternative bidding systems.[17] The statute thus recognizes that, in appropriate circumstances, some of the alternative bidding systems may not be used. Plainly, Congress considered close congressional scrutiny to be sufficient restraint on the Secretary's discretion to choose among the statutory options.

In short, nothing in the statute suggests that Congress intended to channel the Secretary of the Interior's discretion in choosing among the alternative bidding systems, and nothing in the statute singles out the non-cash-bonus systems for special consideration. Therefore, we conclude that the language of the 1978 Amendments requires experimentation with at least some of the new bidding systems, but leaves the details to the Secretary's discretion.

## B

According to the respondents, however, the legislative history of the 1978 Amendments mandates constraints on the Secretary of the Interior's discretion not expressly stated in

---

[17] Section 1337(a)(9)(D) requires the Secretary of Energy, in consultation with the Secretary of the Interior, to report to Congress "why a particular bidding system has not been or will not be utilized." Section 1343(2)(A) requires the Secretary of the Interior to report to Congress "the reasons why a particular bidding system has not been utilized."

the statute. In particular, the respondents cite the repeated, unfavorable references to "cash bonus" bidding found throughout the legislative history to support their contention that Congress intended to direct the Secretary of the Interior to experiment with bidding systems in which the bidding variable is not the size of a cash bonus.

What clearly emerges from the legislative history, however, is not congressional dissatisfaction with all forms of cash bonus bidding, but rather with large front-end payments. Plainly, Congress intended to encourage more competitive bidding by requiring experimentation with bidding alternatives, regardless of the bid variable involved, that would reduce the size of the front-end payments associated with the traditional cash bonus bid, fixed royalty system.[18]

---

[18] The Senate Report, S. Rep. No. 95–284, pp. 46–47, 73 (1977), put it this way:

"S. 9 authorizes a wide variety of new bidding systems. These are designed to reduce the front end cash bonus, increase the government's return on actual production of oil or gas, make it easier for smaller companies to enter the OCS development business, and increase the availability of funds for exploration.

.        .        .        .        .

"In order to assure that these alternatives will be used, the bill limits the Secretary's authority to use the cash bonus-fixed royalty system which has been the historical method of OCS bidding . . . .

.        .        .        .        .

"The basic thrust of all these new options is to reduce the reliance on large front-end cash bonuses as the means of obtaining a fair price for the public's property. The committee wants to authorize lease allocation systems that would encourage the widest possible participation in competitive lease sales consistent with receipt by the public of fair market value for its resources. The committee believes that net profits share and other arrangements can be effective in shifting Government revenue away from initial bonuses and into deferred payments made out of a leaseholder's profits based on actual production of oil or gas."

The House Report, H. Rep. No. 95–590, pp. 47, 138–139 (1977), echoes the Senate's conclusions:

"At present, the cash bonus system is used almost exclusively. Under

Such a reduction of the front-end payments can be achieved, however, with any bidding system that increases the amount of the payments made throughout the life of a lease, since a bidder will be willing to pay less "up front" if he expects to pay more "downstream." This inverse relationship between the size of up-front and downstream payments holds true, of course, regardless of which factor is used as a bidding variable. Congress plainly understood this relationship, because it expressly included three new cash bonus bid systems among the experimental alternatives intended to reduce large front-end payments.

Contrary to the respondents' suggestions, Congress' references to "bonus bidding" and the "cash bonus system," when seen in context, are merely a shorthand description of the

---

that system, in order to win a lease, a company must have vast amounts of capital, and the price to the company is set without full knowledge of the value of the oil and gas in the area. This may reduce competition for off-shore leases to the major oil companies and reduce the public return for resources. To increase competition for off-shore leases and secure higher returns to the public Treasury, section 8 of the Outer Continental Shelf Lands Act has been amended to allow the Secretary to use other bidding methods based on net profits; royalty; or work commitments stated in dollar amounts.

  .    .    .    .    .

"Witnesses before the committee indicated that the high front-end bonus bids may have created a barrier to the entry of small and medium-sized oil firms as well as other potential exploiters, to the OCS activity, and that these types of bids do not, after the completion of exploitation of a lease area, provide a fair return to the Government.

  .    .    .    .    .

"[T]he 1977 amendments authorizes *[sic]* new bidding options. The basic thrust of all these new options is to reduce the reliance on large front-end cash bonuses as the means of obtaining a fair price for the public's property. . . .

"In order to assure that these new bidding alternatives are used, the 1977 amendments limit the Secretary's authority to use the cash bonus—fixed royalty system, which has been the historical method of OCS bidding."

*traditional* cash bonus bid, fixed royalty system that was the only system that had been extensively used at the time the 1978 Amendments were under consideration. That the term "bonus bidding" in context refers only to the traditional system is evident because Congress pointedly and repeatedly contrasted the perceived disadvantages of "bonus bidding" with its hopes for the alternatives listed in §§ 1337(a) (1)(B)–(G), although three of those enumerated alternatives retain the size of a cash bonus as the bidding variable. Congressional references to the "cash bonus system" thus implicate only the traditional system described in § 1337(a) (1)(A).[19]

## V

In sum, we are unable to find anything, either in the legislative history or in the 1978 Amendments themselves, that compels the conclusion that the Congress as a whole intended to limit the Secretary of the Interior's discretion to choose among the various experimental bidding systems. It is not for us, or for the Court of Appeals, to decide whether the

---

[19] Of many possible, a single example drawn from the Conference Report, H. R. Conf. Rep. No. 95–1474, p. 92 (1978), suffices to demonstrate this point. The Conference Report summarizes the statutory requirement in § 1337(a)(5)(B) that the Secretary of the Interior experiment with the enumerated alternative bidding systems as follows:

"Bidding systems other than bonus bidding, including royalty, net profit, work commitment, and nonenumerated systems, are to be utilized in at least 20 percent and not more than 60 percent of the tracts offered for leasing in *all* OCS areas during each of the next 5 years." (Emphasis in original.)

Plainly, the reference to "bonus bidding" is to the traditional system specified in § 1337(a)(1)(A). Otherwise, the summary is simply wrong, because three of the enumerated alternatives retain the size of a cash bonus as the bidding variable. Similar examples are found throughout the legislative history. See H. R. Rep. No. 95–590, pp. 47, 138–139, 141 (1977); S. Rep. No. 95–284, pp. 46–47 (1977); H. R. Conf. Rep. No. 95–1474, *supra*, at 93.

Secretary of the Interior is well advised to forgo experimentation with the non-cash-bonus alternatives. That question is for Congress alone to answer in the exercise of its oversight powers.

For these reasons, the judgment of the Court of Appeals compelling the use of non-cash-bonus bidding systems is hereby reversed.

*It is so ordered.*