MARATHON OIL COMPANY and Mobil Oil Exploration & Producing Southeast, Inc., Plaintiffs–Appellees,

v.

UNITED STATES, Defendant–Appellant.

No. 97–5146.

United States Court of Appeals, Federal Circuit.

May 13, 1999.

E. Edward Bruce, Covington and Burling, of Washington, DC, for plaintiffs-appellees. With him on the brief was Steven J. Rosenbaum.

Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, for defendant-appellant. With him on the brief were, Stuart E. Schiffer, Deputy Assistant Attorney General, and David M. Cohen, Director.

J. Berry St. John, Jr., Liskow & Lewis, of New Orleans, Louisiana, for amici curiae. With him on the brief was Craig Wyman.

Before NEWMAN, PLAGER, and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge PLAGER. Dissenting opinion filed by Circuit Judge PAULINE NEWMAN.

### ORDER

A combined petition for rehearing and suggestion for rehearing in banc having been filed by appellees, and a response thereto having been invited by the court and filed by the appellant,

Upon consideration thereof, it is

ORDERED that the petition for rehearing be granted for the limited purpose of clarifying this court's opinion.

IT IS FURTHER ORDERED that the previous opinion of the court in this appeal is withdrawn. The new opinion accompanies this order.

IT IS FURTHER ORDERED that the suggestion for rehearing in banc is declined.

The mandate of the court will issue on May 20, 1999.

Circuit Judge PAULINE NEWMAN dissents in a separate opinion.

Circuit Judge RICH, Circuit Judge MICHEL, Circuit Judge CLEVENGER, Circuit Judge SCHALL, and Circuit Judge BRYSON did not participate in the vote.

PLAGER, Circuit Judge.

This is a contract dispute between a lessor, the United States ("Government"), and lessees, Marathon Oil and Mobil Oil (collectively "Marathon"), involving Outer Continental Shelf ("OCS") oil and gas leases on submerged lands off the coast of North Carolina. The dispute centers over the denial by the Government of the permits necessary before Marathon could engage in oil exploration, and the effect of legislation enacted subsequent to the parties entering the leases. The legislation imposed a temporary moratorium on oil exploration in the lease areas. Marathon initially pursued administrative appeals of its permit denials, then sued in the Court of Federal Claims to recover its lease rental and up-front cash bonus payments. Marathon claimed that the legislation effected a material breach of the OCS leases. The Government denied the breach and presented a number of defenses. The Court of Federal Claims agreed with Marathon, finding that the Government had materially breached the leases. *See Conoco Inc. v. United States,* 35 Fed.Cl. 309 (1996). In a subsequent proceeding, the court awarded both Marathon and Mobil restitution of their up-front payments, in total over $156 million. *See Marathon Oil Co. & Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* No. 92–331C (Fed.Cl. July 24, 1997). Because the moratorium legislation was not the operative cause of Marathon's failure to obtain the required permits, the judgment of the Court of Federal Claims is reversed.

## BACKGROUND

This case has a rather complicated legal and factual background. We summarize the salient law and the history of the case; for the full details see the exhaustive Court of Federal Claims opinion in *Conoco Inc. v. United States,* 35 Fed.Cl. 309, 314–19 (1996).

### A.

The Outer Continental Shelf Lands Act of 1953 ("OCSLA"), 67 Stat. 462, *as amended,* 92 Stat. 629 (codified at 43 U.S.C. §§ 1331–1343 (1970)), establishes federal jurisdiction over submerged lands on the continental shelf beyond three miles from the coastline. (Submerged lands within the three mile limit fall within the jurisdiction of the individual coastal states.) *See* 43 U.S.C. §§ 1301, 1331(a) (1994).

Pursuant to the OCSLA, the Secretary of the Interior ("the Secretary") is authorized to grant oil and gas leases on OCS lands through a competitive bidding process. *See id.* § 1337(a) (1994). OCS leases run initially for five to ten years, but may be extended for as long as drilling or production is taking place on the leased tract. Lease terms grant lessees the "exclusive right and privilege to drill for, develop, and produce oil and gas resources," in exchange for an up-front cash bonus and periodic lease payments.

Obtaining a lease is one thing; obtaining the necessary permits to first explore and then produce is another. The OCSLA statutory scheme calls for specific submission and approval requirements for each step in the process of exploration, development, and production of OCS-derived oil or gas. In addition to approvals from the Department of the Interior ("DOI"), approvals may also be required from various state and federal agencies.

The first step in the process, exploration, begins with submittal by the lessee to the Secretary of a plan of exploration ("POE"). *See* 43 U.S.C. § 1340(b), (c)(1).

The plan must comply with all provisions of the statute, the extensive regulations prescribed by the statute, and the terms of the lease. When the plan with such modifications as may be necessary are found by the Secretary to so comply, the Secretary must approve the POE within thirty days unless the Secretary determines that the proposed activity under the lease would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits, to the national security or defense, or the marine, coastal, or human environment, and the proposed activity cannot be modified to avoid such harm. *See id.* § 1340(c)(1) (1994) (incorporating the provisions of § 1334(a)(2)(A)(i)). The Secretary is authorized to suspend operations under the lease temporarily upon finding that a similar threat exists subsequently. *See id.* § 1334(a)(1)(B).

Once the POE is approved, the DOI may consider issuance of the permits and approvals that are required before actual drilling takes place. In applying for a required federal license or permit, an applicant whose activities will affect land or water uses in the coastal zone of a state – such as North Carolina – with a federally approved coastal zone management program must provide to the federal licensing or permitting agency a certificate that its proposed activities comply with the state's approved program. *See* 16 U.S.C. § 1456(c)(2) (1994). The Coastal Zone Management Act ("CZMA") requires state concurrence with an applicant's consistency certification. *See id.* § 1456(c)(3)(B)(i). If the state objects, an applicant may appeal that determination to the Secretary of Commerce. *See id.* § 1456(c)(3)(B)(i)-(iii). The Secretary of Commerce has authority to override the state's objection by finding that the POE is consistent with the CZMA objectives or is otherwise necessary for national security interests. *See id.*

In addition to the requirement for an approved POE, the implementation of which requires state concurrence (or override) under the CZMA, if the POE includes discharge of pollutants into the ocean a National Pollutant Discharge Elimination System ("NPDES") permit must be obtained from the Environmental Protection Agency ("EPA"). *See* Federal Water Pollution Control Act, 33 U.S.C. §§ 1311(a), 1342(a) (1994). Again, state concurrence under the CZMA is required before an NPDES permit may be granted. *See* 16 U.S.C. § 1456(c)(3)(A).

### B.

The leases at issue were acquired in 1981 when Marathon Oil Company, Mobil Oil Exploration and Producing Southeast Inc., and Amerada Hess Corporation each bought ⅓ undivided interests in five North Carolina OCS leases. The three corporations each paid the Government more than $78 million in front-end cash bonuses and subsequently paid the Government approximately $264,000 in annual rentals during the ten year primary term.

The first planned activity involving the leased land resulted from the combination of Marathon and other North Carolina OCS lessees into a single entity known as the Manteo Unit. The Manteo Unit proposed drilling one exploratory well about forty-five miles east of Cape Hatteras. In July, 1989, after initial objections to the proposed POE by the State of North Carolina, the state, the DOI, and the Manteo Unit operator entered into a Memorandum of Understanding ("MOU") calling for a special environmental review before the DOI would act on the Manteo Unit POE.

The Manteo Unit also needed to obtain a NPDES permit from the EPA for the POE. The permit was required because the POE included planned discharge of wastes into the ocean. *See* 33 U.S.C. §§ 1311(a), 1342(a).

The environmental review required by the MOU issued in June, 1990. Following

review of the three-volume report, the DOI determined that the POE would not result in any significant environmental impacts and was deemed as far as the DOI was concerned, to be "approvable in all respects." However, on July 17, 1990, North Carolina objected to CZMA certification of Mobil's NPDES permit application.

Before any further action was taken, and before any permit requests were acted upon, Congress, in August, 1990, enacted the Outer Banks Protection Act ("OBPA") in direct response to environmental concerns raised by North Carolina. The OBPA essentially placed a temporary moratorium on exploration or development of the North Carolina OCS, and created an Environmental Sciences Review Panel ("ESRP") to study the impact of any proposed OCS development, *see* OBPA § 6003(c)(3)(A).

Specifically, the OBPA prohibited DOI from approving any POEs, PODs, or permits to drill on the North Carolina OCS until the later of October 1, 1991, or forty-five days of continuous congressional session following DOI's receipt of an ESRP report and submission of a certificate by the Secretary reporting that he had sufficient information to carry out his responsibilities under the OCSLA, *see id.* § 6003(c)(3)(A)(ii)(I). In light of the enactment of the OBPA, the Mineral Management Service ("MMS") of the DOI suspended all leases offshore of North Carolina as of August 18, 1990, at the same time lifting the obligation to pay rentals on the leases.

In spite of the enactment of the OBPA, on August 20, 1990, Mobil, on behalf of the Manteo Unit, submitted its final plan of exploration to drill an exploratory well. On November 19, 1990, North Carolina officially objected to the Manteo Unit's certification that its exploration plan would comply with the CZMA. Unless overridden, North Carolina's objections to Mobil's CZMA certifications of the POE and the NPDES applications effectively barred the requested NPDES permit and any implementation of the POE.

The Manteo Unit partners pursued appeals of North Carolina's CZMA objections to the Secretary of Commerce. On September 2, 1994, Commerce found the proposed POE and proposed discharges of drilling wastes to be "neither consistent with the objectives of the CZMA nor necessary in the interests of national security," and declined to override North Carolina's objections.

In January, 1992, the ESRP issued a final report on the Manteo Unit POE to the Secretary of the Interior. The Secretary then issued a report to Congress in April, 1992, certifying that he possessed sufficient information to perform his obligations under the OCSLA for approval of the single-well POE. By the terms of the OPBA, the temporary moratorium imposed on secretarial action by the OPBA lifted after the next forty-five days of congressional session.

However, the Secretary on his own initiative then deferred approval of the POE until the MMS completed two ESRP-recommended studies. Following the Secretary's April 1992 certification, which MMS treated as lifting the OBPA's bar on exploration of the Manteo Unit, Mobil requested additional suspensions of the Manteo Unit leases until both the additional ESRP studies were completed and Mobil's appeals of North Carolina's 1990 CZMA objections were decided.

MMS lifted the North Carolina OCS lease suspension in November, 1994, after the MMS released the two ESRP-recommended studies and the Secretary of Commerce had declined to override North Carolina's objections to the Manteo Unit POE and NPDES permit applications. Congress repealed the OBPA in 1996. *See*

**1336**

Pub.L. No. 104–134 Title I, Department of the Interior § 109, 110 Stat. 1321–177 (1996).

## C.

In October 1992, Mobil and Marathon, together with a number of other OCS oil and gas lessees of the Government, intervened in a breach of contract action before the Court of Federal Claims between the United States and Conoco over OCS leases off the coasts of Alaska, Florida, and North Carolina. Eventually, all the OCS lessees reached compromise settlements with the Government, allowing entry of final judgments and cancellation of their leases. Marathon and Mobil, however, reserved the right to and maintained all claims with respect to the OBPA's effect on the OCS leases off the coast of North Carolina.

Thereafter, on cross-motions for summary judgment, the Court of Federal Claims held that the Government's "failure [to carry out its contractual obligations], under the restrictions adopted pursuant to the OBPA, was a material breach of the leases," entitling Mobil and Marathon to damages. *Conoco Inc. v. United States*, 35 Fed.Cl. 309, 331 (1996). The court reached its conclusion by finding that the OCS lease terms were not subject to future or subsequent statutes and their related regulations, including something as unforeseeable as OBPA. *See id.* at 323–24. Within the lease terms, the court found that the Government had a duty to consider lessees' POEs in a timely and fair manner. *See id.* at 328. The Court of Federal Claims concluded that "compliance with the OBPA compelled governmental breach by non-performance accompanied by an anticipatory repudiation thereby giving rise to 'total breach.'" *Id.* at 327. In addition, the court determined that the Secretary of the Interior's powers under the OSCLA did not extend to the suspen-

sion of the leases for OBPA compliance. *See id.* at 329–30.

The court reviewed at length this court's opinion in *Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995), *aff'd*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), and its application to the circumstances under which the United States may be liable for breach despite the sovereign acts doctrine. *See id.* at 331–34. Applying the four *Winstar* factors, the court found that the United States was liable for breach stemming from the OBPA because the Act violated the objective intent of the parties to the OSC leases by prohibiting exploration and development, and because the parties' mutual assent as expressed in the leases cannot be subverted by a governmental change in environmental regulatory policies. *See id.* at 333–34.

The Court of Federal Claims rejected the government's defense of immunity under the sovereign acts doctrine. The court found that although the OBPA "may have been the result of developing environmental concerns, it was not an act of public, general applicability." *Conoco*, 35 Fed.Cl. at 336. Instead, the court determined that the OBPA was specifically targeted at the plaintiffs and prevented them from exercising their lease rights—exploration of the OCS offshore of North Carolina. *Id.* Because the OBPA "does not constitute a sovereign act," the court concluded that United States was liable for breach of contract. *Id.* In addition, the court determined that the related theory of unmistakability was inapplicable since it "stands or falls with the sovereign acts doctrine." *Id.* at 335.

Subsequently, the Court of Federal Claims held a hearing to determine if restitution of lessees' cash bonuses and rentals should be offset by the amount of benefits received by lessees before enactment of the OBPA. The court concluded that the Government had failed to identify

a legally cognizable benefit and issued judgment in favor of lessees for the $156 million cash bonuses paid, but found that lessees were not entitled to a return of their annual lease rental payments. The Government appeals from the judgment of liability for material breach of contract and from the trial court's restitutionary award.

## DISCUSSION

■ If there are no material facts in dispute precluding summary judgment—and neither party argues there are—our task is to determine whether the judgment granted is correct as a matter of law. *See, e.g., Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1107 (Fed.Cir.1992).

### A.

■ The first question raised is whether the OCS leases are by their terms subject to the OBPA. If the leases as written are expressly subject to future legislation such as the OBPA, then the Government's enactment and enforcement of that act cannot be a breach of the OCS leases. Section 1 of the OCS lease provides that the lease is issued pursuant to the OCSLA and is:

> [S]ubject to the [OCS Lands] Act; Sections 302 and 303 of the Department of Energy Organization Act ...; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, ...; *and all other applicable statutes and regulations.*

(Emphasis added.) The Court of Federal Claims interpreted the phrase "all other applicable statutes and regulations" as not including subsequent legislation such as the OBPA. *See Conoco,* 35 Fed.Cl. at 322–24. We agree. To read the original contract between the parties as incorporating all future actions, whether by statute or regulation, by one of the parties would raise serious questions about illusory contracts, and perhaps questions of due process and other constitutional concerns. Before interpreting a contract in that manner, there would have to be a much clearer statement of the parties' intent to so contract. In any event, because the outcome of the case does not turn on this issue, we need not further dwell upon it.

■ We turn next to the question of the parties' obligations under the OCS lease. Lessees paid a substantial up-front cash bonus and annual rents in exchange for the "exclusive right and privilege to drill for, develop, and produce oil and gas resources." That right, however, was expressly conditioned on compliance with a complex fabric of statutory and regulatory provisions, which included involvement by both federal and state agencies. The lessees were both knowledgeable and sophisticated purchasers, and entered into these leases with their legal eyes wide open.

Section 10 of the lease, entitled "Performance," specifically states that lessees "shall comply with all regulations and orders relating to exploration, development, and production." Pursuant to the OCSLA and relevant regulations, lessees must obtain federal and state approvals and certifications before they may explore or develop the leased areas. *See* 43 U.S.C. § 1340. Accordingly, under the OCS lease, lessees' rights to exploration, development, and production were conditioned upon obtaining the necessary federal and state approvals.

As explained earlier, the regulatory scheme requires that lessees submit a POE for the Secretary of Interior's approval. *See id.* § 1340(c)(1). If the Secretary approves the POE, he may grant an

exploratory license or permit if there is state concurrence under the CZMA; however, the statute is clear that:

> The Secretary shall not grant any license or permit for any activity described in detail in an exploration plan and affecting any land use or water use in the coastal zone of a State with a coastal zone management program ... unless the State concurs or is conclusively presumed to concur with the consistency certification accompanying such plan ... or the Secretary of Commerce makes ... [such a] finding....

43 U.S.C. § 1340(c)(2) (1994).

In this case, North Carolina objected from the beginning to the Manteo Unit's proposed exploration as being inconsistent with its coastal zone program under the CZMA. This led to the MOU between the Manteo Unit, the DOI, and the State of North Carolina in 1989. Pursuant to the MOU, MMS issued an environmental report in June, 1990. Although the DOI then concluded that the Manteo Unit's POE "complied in all respects with [DOI] regulations" and "[t]he Plan, together with its supporting information, [was] deemed to be approvable in all respects," this did not dispose of North Carolina's objections. Furthermore, North Carolina registered its objections to Mobil's and Marathon's NPDES certification of consistency in July 1990, and restated its objections to their POE's certification of consistency in November 1990; North Carolina maintained both of these objections throughout the time that the moratorium imposed by the OBPA was effective.

Whatever restraints on secretarial actions were imposed by the OBPA essentially had no effect upon these OCS leases because exploration could not proceed without North Carolina's concurrence in the POE's CZMA consistency certification or the override provided by law. *Cf. Secretary of the Interior v. California*, 464

U.S. 312, 341, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984) (observing that states with approved CZMA plans "retain considerable authority to veto inconsistent exploration or development and production plans"). Thus, North Carolina's legally valid objection to the consistency certification left unfulfilled the requirement that the lessees demonstrate compliance with applicable statutes and regulations, compliance with which was a prerequisite to obtaining the necessary permits and licenses.

Lessees have not established that their inability to obtain secretarial approval of the POE and to undertake exploratory activity was caused by the moratorium rather than by the fact that they were unable to provide the necessary state concurrence to their certification of CZMA compliance. And even if the Secretary had felt constrained in acting on the application by the provisions of the OBPA, the law is clear that, had he been free to act, he could not have issued any permits for exploration so long as North Carolina's objections remained in force. *See Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 804–06 (Ct.Cl.1978) (finding that government delay in permit approval was irrelevant because it was not the primary cause of delay).

Congress specifically conditioned offshore oil exploration on the principle that environmental factors could not be ignored, and specifically made the activity subject to express compliance with extant coastal zone management programs. Under the circumstances of this case, to treat Marathon's failure to obtain the necessary approvals and permits for exploratory activity as a breach of contract by the Government would be to eviscerate these salutary protections of the nation's fragile coastal lands and waters. The trial court viewed the moratorium imposed by the OBPA as having indefinite duration and unavoidable consequences. In fact, appellees' failure to overcome North Carolina's

objections resulted in a delay that preceded and extended throughout the period in which the OBPA was effective.

Marathon argues that this case is not just about a delay in the approval of the POE for the North Carolina OCS leases. Appellees characterize the OBPA as constituting a "continuing, open-ended prohibition of *any* exploration of the North Carolina OCS and *any* development and production of oil and gas resources in that area." For the reasons noted, that is not a correct description of the OBPA. Even if it were, the argument ignores the fact that the lessees had failed to submit a POE that carried with it state concurrence with the CZMA consistency certification. The record shows that the state's objection to appellees' NPDES permit application was based on "Mobil's failure to provide data and information necessary to allow the State to conduct a proper consistency review of the proposal on its merits." Likewise, North Carolina's objection to the Manteo Unit POE CZMA consistency certification was due to the inadequacy of the information provided by Mobil.

Appellees argue further that North Carolina's CZMA consistency objection was not independent of the Government's actions because the Secretary of Commerce rejected lessees' request to override North Carolina's CZMA objections based "in large part on the OBPA and on the findings of the OBPA Panel." It appears from this that appellees' real complaint is that the Secretary of Commerce refused to override North Carolina's CZMA objections; this issue is not before us on appeal so we do not address it further.[1]

We have considered appellees' remaining arguments regarding contract breach, and find them unpersuasive.

### B.

■ Appellees argue that even if their leases are subject to state objection over the CZMA consistency certification, the OCSLA provides for cancellation of the leases and restitution in such a situation. In support of their contention, Marathon claims that 43 U.S.C. § 1337(b)(4) "shows that Congress intended lessees to receive compensation for their leases if the Government in any way precluded them from exploration." Section 1337(b)(4) entitles the lessee to "explore, develop, and produce the oil and gas contained within the lease area, conditioned upon due diligence requirements and the approval of the development and production plan required by this subchapter." We fail to see how this language shows any such intent. The OCSLA does give the Secretary authority to cancel the leases under certain circumstances, entitling a lessee to compensation. *See* 43 U.S.C. §§ 1334(a)(2), (c)-(d); 1340(c)(1); 1351(h)(1)-(2). Those sections are not applicable to the case before us, and Marathon does not claim that they are.

■ Nor is there any other basis under the lease for the lessees to claim restitution of some or all of their money. The OCS lease grants lessees the "exclusive right and privilege to drill for, develop, and produce oil and gas resources," in exchange for an up-front cash bonus and periodic lease payments. This right, however, is contingent upon lessees' agreement to "comply with all regulations and orders relating to exploration," including the need for federal and state approvals. Therefore, "[u]nder the plain language of OCSLA, the purchase of a lease entails no right to proceed with full exploration, development, or production . . .; the lessee acquires only a priority in submitting plans to conduct those activities . . . [upon disapproval] no further exploration or development is permitted." *Secretary of the Interior v. California,* 464 U.S. at 339, 104 S.Ct. 656.

The Supreme Court has recognized that only the major oil companies can "risk

---

1. We note that appellees have filed an action challenging the Secretary of Commerce's decision. *See Mobil Oil Exploration v. Brown,* 920 F.Supp. 1 (D.D.C.1996).

paying a large [up-front] cash bonus to lease a tract of unknown value." *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 154, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981). In this case, Mobil and Marathon bid and paid the cash bonuses on the expectation that the leased lands contained substantial oil reserves and could be made productive. *See* James C. Cox *et al., OCS Leasing and Auctions: Incentives and the Performance of Alternative Bidding Institutions*, 2 Sup.Ct. Econ. Rev. 43, 51–52, 54 (1983) (explaining that a bidding process like the OCS lease system which produces a variable, high cash bonus combined with a fixed, low royalty rate places most of the development risk upon the winning bidder rather than on the Government). We see no principled distinction between a lessee whose hopes for large rewards from such a lease are frustrated by a failure to obtain the necessary permits for exploration, and those of a lessee whose hopes are drowned by impossible weather, equipment failures, financial setbacks, or any number of other circumstances beyond the lessee's control. In either case, the lessee contracted for the exclusive opportunity to explore in a certain area; the inability of a lessee to explore, if not attributable to the Government, does not create an entitlement to any refund of the consideration paid to obtain the lease. *See* Thomas J. Touhey *et al.*, 4 *Government Contracts* § 28.40[2], at 28–111 (1998); *cf. Sun Oil*, 572 F.2d at 806.

Since we find no basis for a restitutionary remedy, we need not address the parties' contentions with respect to the manner in which the Court of Federal Claims calculated the amount of restitution.

Marathon and amici make much of the economic consequences of an adverse decision to the future of oil exploration on the OCS. Their fears are overstated, or at the least misplaced. The narrow issue in this case is the impact of the OBPA on the particular leases at issue. We conclude that the lease agreement in this case has not been breached by either party. Rather, Marathon has been unable to obtain the necessary Government approvals that would allow it to go forward with exploration of the lease site, a problem for Marathon that arose in 1989, before the OBPA was enacted, and continued after the OBPA was repealed. This is not a case of a supervening act that makes performance impossible, but simply a playing out of the express provisions of the agreement.

The OBPA was not the cause of Marathon's inability to obtain issuance of the required permits and approvals for its proposed oil exploration, and there is no evidence of a breach of contract by the United States. There is no other basis on which Marathon can claim a return of its contract payments.

## CONCLUSION

The judgment of the Court of Federal Claims in Marathon's favor is

*REVERSED.*

PAULINE NEWMAN, Circuit Judge, dissenting.

This is a contract case. The Court of Federal Claims, determining that the contract between Marathon[2] and the United States was made impossible of performance by governmental action, held that Marathon is entitled to recover what it paid the government for the now-barred contract rights, $156,000,000 paid up-front.

The legal issue is not complex. When one party to a contract prevents the other party from achieving the benefit for which it paid, the party who prevents the performance can not retain the consideration it accepted for the performance. It was not

---

2. I use "Marathon" to include both appellees, Marathon and Mobil.

a "failure to obtain the required permits" through fault of Marathon that barred the exploration of the Manteo tract; it was the change of government policy after the exploration rights had been sold and paid for. Marathon does not challenge the government's change of policy; nor does Marathon seek damages, or specific performance, or other interesting things. Marathon just wants its money back.

The Court of Federal Claims, applying simple contract principles, ordered the government to return this payment. My colleagues now authorize the government to keep it. That is not the law, and it is not responsible government dealing. I must, respectfully, dissent.

## DISCUSSION

Marathon and the government entered into a standard exploration and development contract under the Outer Continental Shelf Lands Act, for the Manteo and an adjacent tract of the Outer Banks, 48 miles offshore North Carolina. In accordance with the Act, 43 U.S.C. § 1337(b)(4) "entitle(s) the lessee to explore" its tracts. That entitlement was negated when the government refused to issue the requisite permits, barring all exploration. This refusal was at the behest of North Carolina, who obtained a congressional moratorium on exploration of the Outer Banks. When this moratorium ended in 1996 the federal government refused to override North Carolina's objection, although it had that right by statute. This eliminated Marathon's exploration right. While.it was the objection of North Carolina that led to the prohibition of exploration of the Outer Banks, first by state refusal to certify the exploration, then by enactment of the Outer Banks Protection Act, and then by the refusal of the Secretary of Commerce to override the state's objection, this does not justify the federal government's confiscation of Marathon's payment for a contract

entered into before any such objection arose.

The panel majority, legitimizing the government's action, defines the issue as "the narrow issue of the impact of the Outer Banks Protection Act." That is inaccurate, for Marathon did not through this Act acquire a risk of forfeiture of its payment for exploration. Indeed, the panel majority raises no issues of "sovereign action" or other discarded theory, and simply rules that Marathon bore the risk that there would arise intractable state objections in which the federal government would acquiesce. However, the exploration of the outer continental shelf was and is within the control of the federal government. When the government tardily decided to withdraw exploration rights for the Outer Banks, contract law and fair dealing require that Marathon's payment for the right of exploration be returned. The issue is not whether Marathon can bear the risks of exploration, *see* maj. op. at 1339, but whether the government shall deal fairly and legally with its contracting partners.

The panel majority appears to misunderstand Marathon's argument. For example, Marathon does not argue that every exploration plan it might have submitted must be approved (although the Department of the Interior described Marathon's Manteo tract plan as "the most comprehensive exploration plan ever submitted to the agency"). As the Court of Federal claims recognized, the governmental obligation was to "timely and fairly consider" exploration plans that were properly submitted. *Conoco Inc. v. United States*, 35 Fed.Cl. 309, 327 (Fed.Cl.1996). The Outer Continental Shelf Lands Act set thirty days for this consideration. However, the Outer Banks Protection Act precluded action on Marathon's exploration plan during the OCSLA time frame.

The Outer Banks Protection Act was enacted after the contract with Marathon

was made and paid for. These subsequent events were all outside of the control of Marathon. It is the government that prohibited performance of the contract. The common law of rescission and restitution, the statutory remedy of 43 U.S.C. § 1334(a)(2)(C), and precedent, all require remedy for this post-contract negation of the government's promise.

It is hornbook law that when a contract becomes impossible of performance through events outside the control of a party, restitution is an appropriate remedy. *See 5 Corbin on Contracts* § 1112 at 549 (1964) ("a party who is excused from performance by supervening impossibility is not privileged to keep something for nothing, and restitution is an available remedy against him"); *Restatement (Second) of Contracts* § 272 (discussing forms of relief such as rescission when contract performance becomes impracticable), § 264 (governmental regulation can render performance impracticable and be subject to relief), § 377 (remedy of restitution is appropriate in cases of impracticability and frustration of contractual purpose).

In addition, the Outer Continental Shelf Lands Act provides that the Secretary of the Interior can disapprove an exploration plan based on perceived harm to the environment, and that when environmental harm or other causes of disapproval can not be avoided by the exploration, the Secretary may cancel the lease, but in such event "the lessee shall be entitled to compensation." 43 U.S.C. § 1334(a)(2)(C). Potential causes of disapproval are listed in § 1334(a)(2)(A)(i), *viz.*, "(i) continued activity pursuant to such lease or permit would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral (in areas leased or not leased), to the national security or defense, or to the marine, coastal, or human environment." Environmental objections were raised by North Carolina. The government has not,

however, cancelled Marathon's lease, although it has rendered exploration impossible by refusing the necessary permits, despite the Interior Department's ruling that Marathon's Plan of Exploration and environmental report were "approvable in all respects." Marathon's conceded compliance with the federal environmental criteria raises, at a minimum, issues of fair dealing when state objections are relied on for withdrawal of the federal right without return of the federal consideration.

A wealth of precedent illustrate the remedies of rescission and restitution when performance of a contract is rendered impossible. *E.g., Stone Forest Industries v. United States*, 973 F.2d 1548 (Fed.Cir. 1992) (restitution of sums paid when intervening environmental legislation prevented performance of a timber contract); *Aerojet–General Corp. v. Askew*, 453 F.2d 819, 831 (5th Cir.1971) ("The failure to render a promised performance may not be a breach of contract for the reason that performance has become impossible without fault; but it is nonetheless a failure of consideration discharging the other party from his duty to make the agreed return and giving him a right to the restitution of payments already made or other benefits already conferred.") (quoting 6 Corbin on Contracts, § 1255); *E.H. Boly & Son, Inc. v. Schneider*, 525 F.2d 20, 23–24 (9th Cir. 1975) ("Any voluntary affirmative act of a party which renders substantial performance of his contractual duties impossible, or apparently so constitutes a total breach and warrants a suit seeking cancellation and restitution.... When one party repudiates a contract or commits a total breach thereof, the injured party has an election to pursue one of three remedies; he may treat the contract as at an end and sue for restitution, he may sue for damages, or he may sue for specific performance in certain cases.") (citations omitted).

The panel majority, authorizing the United States to keep Marathon's payment, explains that there is "no principled

distinction" between payment for a right of exploration that has been performed but failed to find oil or encountered adversity such as weather, and payment for a right of exploration that has not been performed because it was prohibited by the government after it was paid for. According to the panel majority, in either case the government is entitled to retain the payment for the exploration right. This analysis is not supportable by any legal or equitable theory. What Marathon paid for was the right of exploration. Marathon bore the risk that the exploration might fail to find oil or gas, but Marathon did not bear the risk that exploration would be entirely barred, especially by the same party from whom it bought the right.

I do not fault the decision now to bar exploration of the Outer Banks; I fault the refusal to give back what Marathon paid for the right to explore the Outer Banks. Whatever the government's power to avoid its contractual obligations, this does not also entail the right to retain the consideration paid in contract. The Court of Federal Claims correctly analyzed the issues, applied the correct law, and reached a proper and just conclusion. That decision should be affirmed.