**LANDMARK LAND COMPANY, INC., Plaintiff,**

**and**

**Federal Deposit Insurance Corporation, as Successor to the Rights of Oak Tree Savings Bank, a State Savings Bank, Plaintiff–Intervenor,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 95–502 C.**

United States Court of Federal Claims.

March 3, 2000.

Paul M. Fish & R.E. Thompson, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, Richard L. Tapp, Jr., Nexsen, Pruet, Jacobs, Pollard & Robinson, L.L.P., Charleston, South Carolina, and John L. Napier, Winston & Strawn, Washington, D.C., for plaintiff Landmark Land Company.

Richard H. Kamp, Richard S. Falkow, John V. Thomas, Norman Friedman, Richard S. Gill, and Linda Marcusen, Federal Deposit Insurance Corporation, Dallas, Texas, & Washington, D.C., for plaintiff-intervenor.

Arlene Pianko Groner, Glenn Chernigoff, Gary Dernelle, Richard Evans, Tom Forgue, Elizabeth Frank, Craig Gottleib, Joanne E. Johnson, Matthew D. Lee, Delisa Sanchez, Tarek Sawi, Edward P. Sullivan, and Tonya J. Williams, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

HODGES, Judge.

The Supreme Court has ruled that the United States breached its contracts with certain financial institutions when it enacted the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA). *United States v. Winstar Corporation,* 518 U.S. 839, 843, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). FIRREA affected a number of financial institutions, many of which have cases pending in this court to determine damages. The breach in Landmark's instance arises in connection with a 1982 agreement by which Landmark took over a failing thrift from the Government by contributing cash and real property. In return, it received various promises relating to treatment of capital and goodwill.

FDIC's claim stems from a 1986 transaction whereby Dixie Savings and Loan, the thrift acquired by Landmark in 1982 contributed assets to another failing institution, and in exchange received certain forbearances from the regulators. FDIC also maintains a claim relating to goodwill stemming from the 1982 transaction.[1]

The law of this case is that FIRREA breached plaintiffs' contracts; we are directed to determine damages flowing from that breach. *Landmark Land Co., Inc. v. United States,* 44 Fed.Cl. 16, 18 (1999); *see also California Federal Bank v. United States,* 39 Fed.Cl. 753 (1997) (Opinion of Chief Judge Smith addressing liability of the Government in several *Winstar*-type cases) (*CalFed I*).

Landmark seeks restitution of the assets that it contributed to Dixie Federal Savings and Loan in 1982 and 1983, their "lost use value," and non-overlapping reliance damages relating to those contributions. FDIC is a party here as successor to the rights of the failed thrift in this case, Oak Tree Savings Bank.[2] It claims recission and restitution and the value of the unamortized goodwill lost by the failed thrift as a result of the breach.

Defendant argued at trial that Landmark's claims should be forfeited because it committed fraud against the United States. We devoted three weeks of trial to this allegation and found that the charges lacked merit. Trial on damages began October 11.

Testimony at trial established that Landmark was entitled to restitution for the assets that it contributed to Dixie in 1982. While plaintiff had good business reasons to contribute stock to Dixie in 1983, the 1982 Agreement did not require or even contemplate such a contribution. FDIC as receiver for the failed thrift is entitled to restitution for the benefit conferred on the United States in the 1986 acquisition of St. Bernard, another failing institution.

## BACKGROUND

Landmark Land Company was a real estate development company specializing in golf-oriented residential and resort development. It had no involvement in the savings and loan industry until 1982. Landmark entered into a contract with the Federal Savings and Loan Insurance Corporation in 1982 to acquire two failing thrifts: Dixie Federal Savings and Loan Association and Heritage Federal Savings and Loan Association. The contract is referred to in this Opinion as the Assistance Agreement. As part of the transaction, the institutions were merged and thereafter called Dixie.

The Assistance Agreement required Landmark to contribute not less than $20 million

---

1. When referring to plaintiff we refer only to Landmark Land Company or Landmark. Plaintiff–Intervenor will be referred to as FDIC.

2. FDIC's role in this case arises from an Opinion of this court, ruling that FDIC holds legal title to

claims of the failed thrifts and is the proper party to assert such claims. *See Plaintiffs in All Winstar–Related Cases v. United States,* 44 Fed.Cl. 3 (1999); *see also* 12 U.S.C. § 1821(d)(2).

cash or appraised real estate to Dixie in exchange for certain favorable accounting treatment by the regulators and a FSLIC promissory note for $21 million. Landmark elected to contribute real estate and a small amount of cash.[3] The Agreement provided that Landmark could place the real property contributed on Dixie's books at fair market value. It also had the right to amortize goodwill arising from the transaction over a forty-year period.

Landmark conveyed the balance of its assets to Dixie in 1983. This conveyance was accomplished in two steps. Landmark first contributed substantially all of the real estate that it owned to its wholly-owned subsidiary Unique Golf Concepts, Inc. Then it conveyed the stock of Unique Golf to Dixie. Unique Golf was in effect a holding company for Landmark's remaining real property. It became a subsidiary of Dixie.

Then in 1986, the Federal Home Loan Bank Board approached Landmark about acquiring another thrift, St. Bernard Federal Savings and Loan Association in Louisiana. This acquisition was accomplished pursuant to FHLBB Resolutions and an FHLBB Forbearance Letter.[4] Dixie, through its wholly-owned subsidiary Landmark Land Development Corp. (Landmark Development), transferred substantially all of Dixie's real estate to St. Bernard at fair market value.[5] St. Bernard then became a subsidiary of Landmark Development. St. Bernard received the following corporate assets from Dixie: Landmark Land Company of California, Landmark Land Company of Louisiana, Landmark Land Company of Oklahoma, and Oak Tree Golf Club, Inc.

The corporate structure relevant to this case in August 1986, was as follows: Landmark Land Company served as a holding company to Dixie. Landmark Development was a wholly-owned subsidiary of Dixie. St. Bernard was a wholly-owned subsidiary of Landmark Development. Landmark of California, Landmark of Oklahoma, and Landmark of Louisiana were wholly-owned subsidiaries of St. Bernard.

Almost two years after St. Bernard was acquired, its name was changed to Oak Tree Savings Bank. Thereafter, Dixie was renamed Landmark Savings Bank. Landmark Savings Bank transferred its assets and liabilities to Oak Tree Savings Bank in December 1989, then ceased all operations.

The Financial Institutions Reform, Recovery, and Enforcement Act was enacted in August 1989. FIRREA and its implementing regulations introduced three types of minimum capital requirements: tangible capital, core capital and risk-based capital. The tangible capital requirement imposed a minimum asset level that could not include goodwill. 12 U.S.C. § 1464(t)(9)(C)(1990). The core capital standard permitted limited amounts of "qualifying supervisory goodwill." 12 U.S.C. § 1464(t)(1),(2) and (3)(A)(1990). Risk-based capital had to meet a percentage of risk-weighted assets established by the Office of the Comptroller of the Currency. Supervisory goodwill was subject to a phase-out schedule. FIRREA also required that thrifts phase out impermissible activities such as real estate development within 5 years.[6]

The real estate subsidiaries of Oak Tree Savings Bank filed for protection under Chapter 11 of the Bankruptcy Code in October 1991. Two days later, Oak Tree Savings was seized by the Resolution Trust Corporation. RTC obtained control of Oak Tree's subsidiaries and liquidated the real property assets. The RTC was dissolved by operation of law and was succeeded by the Federal Deposit Insurance Corporation.

## DAMAGE THEORIES

### I. Restitution

■ Landmark and FDIC seek restitution for defendant's breach of contract. The pur-

---

3. The value of the real estate contributed by Landmark to Dixie in 1982 is disputed.

4. This court determined the FHLBB Resolutions and Forbearance letter established a binding contract. *See CalFed I*, 39 Fed.Cl. at 774–775.

5. The assets transferred by Dixie to St. Bernard were essentially the same assets conveyed to Dixie by Landmark in 1983.

6. For a detailed discussion of the changes instituted by FIRREA, refer to *Winstar*, 518 U.S. at 856–857, 116 S.Ct. 2432.

pose of restitution is to prevent unjust enrichment of the breaching party. *See* RESTATEMENT (SECOND) OF CONTRACTS § 344 cmt. a (1981). It is not a damage remedy. *See* D. Dobbs, *Dobbs Law of Remedies* § 4.1(1) (2d ed.1993). Restitution in a breach of contract scenario entitles the non-breaching party to restitution for any benefits "that he has conferred ... on the other party by way of part performance or reliance." RESTATEMENT (SECOND) OF CONTRACTS § 370 (1981). The Restatement measures the restitution interest by either "the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or the extent to which the other party's property has been increased in value or his other interests advanced." *Id.* at § 371. The breaching party is entitled to an offset measured by the value of the benefit it has conferred on the non-breaching party, if applicable. *See id.* at § 374(1).

## II. Reliance

Landmark seeks reliance damages as an alternative to restitution or in conjunction with restitution. The purpose of reliance damages is to place the injured party "in as good a position as he would have been in had the contract not been made." RESTATEMENT (SECOND) OF CONTRACTS § 344(b) (1981). The comments to the Restatement point out that restitution may be equal to the reliance interest, but ordinarily it is smaller because it does not include "expenditures in reliance that resulted in no benefit to the other party." *Id.* at § 344 cmt. a. Unlike restitution, reliance is a damages remedy. It includes "expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." *Id.* at § 349.

## DISCUSSION

### I. Landmark

#### A. The 1982 Assistance Agreement

The 1982 Assistance Agreement required Landmark to contribute

capital in the amount of not less than $20,000,000 to the Resulting Association [Dixie] as of the Acquisition Date. Such capital contribution may take the form of cash, or real estate with an appraised value of not less than $20,000,000, or any combination of cash and real estate with an appraised value equal to at least the difference between $20,000,000 and the cash contributed.

Landmark contributed property to Dixie that it valued at $20,235,000. Plaintiff's valuation did not conform to specified regulatory guidelines and the regulators asked that the appraisal be revised. The revised appraisal valued the property at $18,445,000. Landmark contributed additional real property and cash to satisfy the $1,555,000 shortfall. Plaintiff claims that it contributed $1,353,071 cash and $1,660,500 worth of real estate. It seeks restitution of $21,458,571 for the property and cash contributed to Dixie in 1982.

Defendant does not dispute that Landmark was required to contribute not less than $20 million in cash or real estate pursuant to the Assistance Agreement, but it argues that Landmark's restitution claim should be limited to $20 million. According to defendant, the Assistance Agreement required Landmark to contribute $20 million, and that is the extent to which the Government can be held liable. Any contribution beyond that was voluntary and therefore not compensable under a restitution theory. We disagree.

The Assistance Agreement required Landmark to contribute *not less* than $20 million. In response to that contract term plaintiff contributed cash and property to satisfy its obligation. If defendant had wanted to limit the initial contribution to $20 million it could have said so. It would not have used the phrase "not less than $20,000,000." To read the Assistance Agreement as limiting the initial contribution would be to ignore the stated language. "A contract is read in accordance with its express terms and the plain meaning thereof." *C. Sanchez and Son, Inc. v. United States,* 6 F.3d 1539, 1543 (Fed.Cir.1993) (citing *Hol–Gar Mfg. Corp. v. United States,* 351 F.2d 972, 169 Ct.Cl. 384 (1965); *Hills Materials Co. v.*

*Rice,* 982 F.2d 514, 516 (Fed.Cir.1992)). Where the provisions of the contract are "clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co., Inc. v. Madigan,* 2 F.3d 389, 392 (Fed.Cir.1993) (citing *George Hyman Constr., Co. v. United States,* 832 F.2d 574, 579 (Fed.Cir.1987)). Landmark's initial contribution was the benefit conferred on defendant for purposes of restitution.

█ Landmark produced reputable appraisals valuing its initial contributions of cash and real estate at $21,458,571. Defendant did not present convincing evidence at trial to dispute these values. Thus, $21,458,-571 is the amount to which Landmark is entitled under restitution theory.[7]

### B. The 1983 Stock Contribution

More than one year after its initial contribution, Landmark contributed all of the stock of its wholly-owned subsidiary, Unique Golf Concepts, to Dixie. Unique Golfheld all of Landmark Land Company's real property development holdings. Plaintiff seeks restitution for the value of the assets that it conveyed in 1983. According to Landmark, it bargained for the right to make future conveyances to Dixie during the Assistance Agreement negotiations, and it is entitled to the return of this contribution.

Defendant contends that the contribution of the Unique Golf stock to Dixie in 1983 was a donation not made pursuant to the Assistance Agreement; it was voluntary. While the contract did not prohibit or discourage contributions of capital beyond the initial contribution, they were required only in specific limited circumstances as set forth in the Assistance Agreement. That is, cash and real estate must be contributed to maintain net worth at certain required levels.

Landmark had the obligation initially to contribute capital of not less than $20 million.

Mandatory contributions of capital beyond the initial contribution were made under circumstances set out in section 3(f) of the Assistance Agreement. That section states in part:

> LANDMARK further agrees that, as a continuing condition to the obligations of the [FSLIC] to perform any executory duty under this Agreement, (1) LANDMARK, for a five-year period following the Acquisition Date, will contribute such additional capital to ... [DIXIE] at such times and in such amounts as is needed to maintain ... [DIXIE'S] net worth ... at an amount not less than three percent (3%) of ... [DIXIE'S] total liabilities ...

The capital contributed for these two purposes could take the form of cash or real estate. If real estate were contributed, it was "recorded on the books and records of ... [DIXIE], for all regulatory accounting purposes, at its fair market value ...." The FSLIC had the right to satisfactory evidence of acceptable title to the property as well. But if the capital Landmark used to maintain the net worth at required levels were real estate rather than cash, it was subject to further restrictions:

> Any real estate contributed by LANDMARK to ... [DIXIE], other than that contributed in satisfaction of the initial capital contribution of $20,000,000, may be subject to debt, provided that any such contribution of real estate subject to debt must have prior written approval of the [FSLIC] or Bank Board's supervisory agent ....

Assistance Agreement at § 3(f).

Furthermore, if real estate subject to debt were contributed to the thrift for net worth purposes then Landmark would have been required to "have the prior written approval of the [FSLIC] or Bank Board's supervisory agent ...." The FSLIC wanted Landmark

---

7. Plaintiff seeks an additional $3,355,029 in real estate assets that were "submitted for review and either approved or not objected to by the regulators." However, we hold in the next section that the bases for including contributions in an award of restitution are whether the contributions were made as a part of the initial contribution contemplated by the Assistance Agreement; or whether they were made as required by the contract to maintain the three percent minimum capital requirement. For purposes of restitution, only the requirements of the Assistance Agreement apply in this instance. The result would be different if either the $3 million contribution were made as part of the initial contribution or if it were made to meet the three percent capital requirement, but no such evidence was presented at trial.

to obtain supervisory approval before contributing real estate subject to debt.

Landmark contends that section 3(f) of the Assistance Agreement contemplates that it could contribute additional capital to Dixie for any purpose. That being the case, Landmark asserts that the 1983 contribution falls within the bounds of the Assistance Agreement.

■ A contract must be "so construed as to effectuate its spirit and purpose, [and] it must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions ...." *Arizona v. United States*, 575 F.2d 855, 863, 216 Ct.Cl. 221, 235 (1978); *see also SCM Corp., v. United States*, 675 F.2d 280, 283, 230 Ct.Cl. 199, 203 (1982) (Contracts should be interpreted to give effect to all parts of an agreement). The purpose of the Assistance Agreement was "to provide a means by which the failures of [Heritage Savings and Dixie Savings] may be prevented...."

Section 3(f) is the heart of the Assistance Agreement. The rights and obligations of the parties are found here. The emphasis of the section is on Landmark's obligation initially to contribute not less than $20 million and maintain a three percent net worth. Landmark had a duty to contribute capital for this purpose. Any additions to capital for this purpose could be in the form of real estate equity. That is, the value of the real estate contributed would be reduced by liens or other encumbrances. Presumably regulatory approval was required for contributions of real estate subject to debt, because debt levels affected the net worth ratio. Property contributed with significant debt attached to it could cause the institution to fall out of capital compliance. This is what the regulators were trying to avoid. They wanted Dixie to survive. The intent of the parties was that the institution be maintained at minimum three percent capital for 5 years after the acquisition date.

Landmark conceded that the contribution in 1983 was not made to meet the three percent capital requirement. This was the sole purpose of plaintiff's obligation to contribute real estate *subsequent to the initial contribution.* Dixie's net worth at the time

of the 1983 contribution was well above the three percent minimum required by the Assistance Agreement. Thus, the 1983 contribution was not made pursuant to this provision of the Assistance Agreement.

Rather than contribute real estate directly to Dixie, Landmark contributed the stock of its wholly-owned subsidiary, Unique Golf. That subsidiary held Landmark's golf courses and other real property. Landmark executives obtained legal opinions stating that supervisory approval for the transfer of Unique Golf stock to Dixie was unnecessary. It is true that the 1982 Assistance Agreement did not require supervisory approval for a stock transfer. It did not even mention stock. By transferring the stock of Unique Golf to Dixie rather than transferring the real estate directly, plaintiff avoided costly appraisals and circumvented the approval requirement. The effect of the transfer was to place both encumbered and unencumbered real estate in Dixie. By structuring the transaction in this way, Landmark essentially sidestepped the requirements of the Assistance Agreement.

Plaintiff argues that while the Assistance Agreement does require written approval for encumbered real estate, the regulators were required to approve an application that met all of the filing requirements, unless they determined that the transaction would be detrimental to Dixie or to the FSLIC insurance fund. Approval was just a formality. While that may be true, the Assistance Agreement required Landmark to submit an application that met the filing requirements. This application could be approved only after FSLIC made a determination of the risks. Landmark did not take these steps.

■ Plaintiff cites section 17 of the Assistance Agreement as evidence that the Agreement covers all subsequent contributions of real estate. The language plaintiff focuses on is as follows:

It is the purpose of this Agreement to provide a means by which the failures of ... [HERITAGE] and ... [DIXIE] may be prevented ... and ... [DIXIE] or its subsidiary service corporation(s) *may be provided with property development and*

*loan portfolio opportunities* ... The parties, therefore, agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described herein. (emphasis added).

Plaintiff interprets the phrase "may be provided with property development and loan portfolio opportunities" as evidence that the Assistance Agreement covered subsequent contributions for any reason. This section establishes nothing more than a general obligation on the part of the parties to cooperate with one another. It does not create a contractual obligation of the nature advanced by plaintiff. The purpose of this section is to impress upon the parties the importance of preventing the failure of Dixie. All parties to a contract have an obligation to act in good faith, regardless of whether the contract states it. *See* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). We do not attribute special significance to this section.

█ Landmark argued alternatively that the 1983 contribution was made to alleviate regulator concerns over conflicts of interest. Both Dixie and Landmark Land Company's non-Dixie subsidiaries had property development opportunities. According to plaintiff, the regulators told Landmark that a conflict of interest would exist "as long as Landmark was pursuing property development activity in and out of Dixie." For example, "if Landmark were to pursue property development opportunities outside of Dixie and those projects were successful, then the regulators might contend that Landmark had taken a corporate opportunity that should have been put into Dixie," according to plaintiff.

Gerald Barton was President of Landmark. He testified about several conflict of interest issues concerning real estate development with Landmark and Dixie. Mr. Barton could not recall which regulator had voiced these concerns. He brought to the court's attention a letter from Mr. Olree to Mr. Dermody stating that the 1983 transfer of Unique Golf stock to Dixie's subsidiary "should minimize supervisory concern about potential conflicts of interest between the Association and its holding company affiliates." Mr. Dermody was a FHLBB regulator and Mr. Olree was president of Dixie.

Mr. Dermody was in charge of oversight of conflict of interest issues involving Landmark and Dixie. He was asked at trial whether potential conflict of interest problems between Dixie and Landmark were a concern to the regulators in 1983. "We had no unusual or out of the ordinary concern for Dixie and Landmark at that time," he said. He noted that there was a regulatory requirement dealing with conflicts of interest but "[w]e had no, no concerns about Dixie .... I was the person who should have had concerns if anybody did."

Landmark did not contribute real estate to Dixie because of regulator concerns over conflicts of interest. If it did, it was not required to because the regulators had no such concerns.

Infusion of additional capital helps to maintain the solvency of a thrift, but the Government cannot be held liable for contributions that were not covered by the contract that it breached. Landmark contributed the stock of Unique Golf to Dixie in 1983 voluntarily. It had good business reasons to do so. By contributing the stock, Landmark saved time and money and avoided the need for regulatory approval. Landmark is not entitled to restitution for the 1983 contribution.

### C. Use Value

█ Landmark contends it is entitled to the "use value" of its 1982 and 1983 contribution. This is the value of performing the contract from 1982 until the 1989 breach, and thereafter until judgment is entered. Plaintiff claims that between 1982 and 1989, the Government had the benefit of Landmark's assets as well as the contribution of its management and development expertise that avoided the need to liquidate Dixie. Landmark asserts that it would have had the use of its assets from 1989 to present had the Government not breached its contract. According to Landmark, the assets could have yielded "commercial gain elsewhere in the national economy."

Landmark has proposed three measures of recovery: normal profit method, actual gain method, and reasonable rental value method.

The normal profit method compensates Landmark for the profits it would have earned on the property had it not contributed them to Dixie in 1982 and 1983. The actual gain method approximates Landmark's cost of performance. It takes the net market value of the assets conveyed to Dixie and adds the difference between that value and their net value in 1989. The sum is the actual appreciation in value of the assets contributed. The rental value method provides Landmark with the rental value of the assets for the period in which it was deprived of their use.

We have ruled that the 1983 contribution was not made pursuant to the 1982 Assistance Agreement. Landmark was not required to make this contribution; it was a voluntary decision made by Landmark for its own business reasons. We cannot award "use value" for contributions made in 1983.

We are permitting compensation for the 1982 contribution by this Opinion, however. So the issue is whether use value can be applied to the 1982 $21,458,571 contribution. We think it appropriate to reimburse Landmark for everything that it lost by actions of the breaching party, to the extent that those amounts can be justified according to applicable legal standards. We do not hold that plaintiffs in the *Winstar* cases can never be awarded lost profits or "use value" for the money that they lost because of defendant's breach. This is partly a legal issue that we do not address now because factually the theory was unsupported at trial. Landmark did not prove that it lost a specific amount of money from not having the use of the property that it contributed to Dixie in 1982.

To award damages under Landmark's use value theories, we would be required to engage in a series of speculative assumptions that are not permitted in these circumstances. We could not establish at trial how Landmark would have profited from use of the parcels of real estate that it contributed to Dixie in 1982. Expert testimony that Landmark offered for this purpose was not convincing, and we were left with the need to engage in improper speculation. For this reason, we must deny Landmark recovery for use value.

### D. Reliance Damages

Landmark also claims non-overlapping reliance damages for the 1983 contribution. According to Landmark, it relied on rights obtained in the 1982 Assistance Agreement to make the 1983 contribution. Mr. Barton testified that Landmark would not have made any contributions without that contract.

Defendant argues that Landmark is not entitled to reliance damages because Landmark did not prove that the breaching provisions of FIRREA caused it any damage. Even if it had established causation, Landmark did not show that it incurred costs in performing or preparing to perform an obligation under the Assistance Agreement, according to the Government.

Landmark must show causation, certainty, and foreseeability to establish reliance damages. *See Dobbs Law of Remedies* § 12.4, at 777–80. "Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981). Besides requiring an initial contribution of not less than $20 million, the Assistance Agreement required contributions for maintaining net worth. Thus, it was foreseeable that Landmark would contribute capital for that purpose. Yet plaintiff conceded that the 1983 contribution was not made for maintaining capital levels at or above three percent. It was made for alleged conflict of interest concerns and for Landmark's own business reasons. By essentially folding Landmark Land into Dixie, Landmark could borrow more cheaply for its property development business.

The Government was aware that Landmark was in the property development business, but it had no reason to foresee that Landmark would contribute essentially all of its assets to Dixie. It could not foresee at the time of contracting that a breach of the Assistance Agreement would cause Landmark to lose its entire business. Landmark did not contribute the stock of Unique Golf

Concepts in 1983 in reliance on its contract with the Government.

We do not address the other two reliance factors, causation and certainty, because the Government cannot be held liable for reliance damages that were not foreseeable as a consequence of its breach. Moreover, we have ruled that restitution is not available to plaintiff for the 1983 contribution because that contribution was voluntary. If the 1983 contribution was made voluntarily for business reasons and not in reliance on the contract, it follows that reliance damages cannot apply to the 1983 contribution.

## II. FDIC

FDIC seeks rescission and restitution arising from the Government's breach of its contract with Dixie in connection with Dixie's 1986 acquisition of St. Bernard Federal Savings and Loan, and the value of the unamortized goodwill lost by Oak Tree.[8] Dixie acquired St. Bernard in 1986.[9] Landmark Development contributed assets of $715 million in exchange for the stock of St. Bernard and a series of FHLBB Resolutions and regulatory forbearances. *See CalFed I,* 39 Fed. Cl. at 759.

### A. The 1986 Acquisition

 FDIC claims *$641.9 million in restitution* for the fair market value of all assets contributed by Dixie, net of liabilities and unassumed secured debt. The purpose of restitution is to disgorge the benefits received by the breaching party and to place the nonbreaching party in its pre-contract status quo. *See* RESTATEMENT (SECOND) OF CONTRACTS § 344 cmt. a (1981).

 When Dixie took over St. Bernard in 1986, the deficit net worth of St. Bernard was $17.7 million. Chief Judge Smith ruled that the benefit to the Government in this case

was its being relieved of the obligation to liquidate a failing bank. *CalFed I,* 39 Fed. Cl. at 775 (citing FHLBB Resolution 86–693 at 5). The Government was relieved of the obligation to liquidate the thrift at a cost of $17.7 million, but Dixie contributed far more than that to St. Bernard. The larger the contribution, the more solvent St. Bernard became. In fact, Resolution 86–801 approved Dixie's acquisition of St. Bernard and the marked-to-market transfer of the Dixie subsidiaries and the real estate to St. Bernard. FDIC argues that the benefit the Government received was $641.9 million.

Defendant argues that FDIC cannot recover damages because it did not establish that the breach caused it harm, citing *Marathon Oil Co. v. United States,* 177 F.3d 1331, 1340 (Fed.Cir.1999). In *Marathon Oil,* lessees of an oil and gas lease brought an action against the United States claiming that legislation restricting development enacted after leases were entered constituted a breach of contract. The lessees sought restitution of upfront lease payments made to the Government. The Court of Appeals held that no breach occurred because while the Government may have placed restraints on the ability of plaintiff to drill, the exploration could not have proceeded without North Carolina's approval. *Id.* at 1338–1340. The court found that the lessees did not establish that their inability to undertake exploratory activity was caused by the Government rather than by the fact that they had not obtained necessary state concurrence. *Id.* at 1338. As for restitution, the lessees contracted for the right to explore, and if the inability to explore was not attributable to the Government then there is no entitlement to a refund of the consideration paid. *Id.* at 1339.

In *Marathon Oil* therefore, the court found that no breach had occurred. Plain-

---

**8.** The corporate structure of the various entities that have been a part of plaintiff Landmark and their history are described on pages 4 and 5 of this Opinion. Dixie Savings and Loan was the entity that contributed assets to St. Bernard in 1986. That transaction provided the restitution cause of action for plaintiff FDIC in this case. St. Bernard changed its name to Oak Tree Savings and Loan and Dixie changed its name to Landmark Savings. The two thrifts merged and were called Oak Tree at the time of the receiver-

ship. We will use the name Dixie in the place of Oak Tree hereafter for consistency and ease of reference, through the end of the discussion of plaintiffs' arguments.

**9.** This acquisition was accomplished by the conversion of St. Bernard into a stock association and acquired by Landmark Development, a wholly-owned subsidiary of Dixie. *See CalFed I,* 39 Fed.Cl. at 759.

tiffs could not recover restitution because they were required to obtain state approval irrespective of the federal legislation that applied. Restitution was not available because the actions of which plaintiffs complained were not attributable to the United States. There was no basis for a restitutionary remedy because the contract was not breached.

Defendant in essence is arguing that *Marathon Oil* provides a new standard for restitutionary recovery. Because the plaintiffs in *Marathon Oil* could not establish that the breach was due to the actions of the United States, defendant argues here that a restitution analysis involves determining whether the breach caused any harm. But restitution is not a damage theory that requires an extensive causation analysis. Marathon Oil does not apply because here we do have a breach. *See Landmark Land Co., Inc. v. United States,* 44 Fed.Cl. 16, 18 (1999). Dixie contributed real estate pursuant to a contract with the United States, and the Government breached that contract. The reason *Marathon* could not undertake exploration was not due to the Government's actions, so restitution was not available. Dixie had to divest its real estate because the Government breached its contract with Dixie. Restitution does apply in this case.

Dixie put $17.7 million into St. Bernard at the date of acquisition. The Government as the breaching party benefitted at least by that amount. *See Acme Process Equip. Co. v. United States,* 347 F.2d 509, 528, 171 Ct.Cl. 324, 356(1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) (cost to the non-breaching party of conferring benefit upon the breaching party is measured as of the time of the performance). A breaching party is enriched if it retains monies received by the non-breaching party without fulfilling its end of the bargain.

The Government did not fulfill the promises that it made to Dixie. *See Landmark Land Co., Inc.,* 44 Fed.Cl. at 18. The non-breaching party is entitled to return of the benefit conferred.

The question is, what is the benefit conferred. The fair market value of the real estate contributed by Dixie in 1986, St. Bernard's deficit net worth of $17.7 million, or some other amount. That is the unique issue that this case raises.[10]

It would have cost the Government $17.7 million to liquidate St. Bernard in 1986, when Dixie took it over. As noted, Dixie contributed far more than 17.7 million, however. It donated assets with a fair market value over $700 million to St. Bernard.[11] But the contract does not specify an amount that the regulators required Dixie to contribute. The "contract" in this case comprises a regulatory Forbearance and certain FHLBB Resolutions; these documents do not present a typical contract. They are directions from the regulators of a unilateral nature. They are unlike the 1982 Assistance Agreement between Landmark and the Government whereby both parties recorded their rights and obligations.

St. Bernard was a thrift in severe financial difficulty and it was continuing to deteriorate. The Government did not want to liquidate St. Bernard, but it was having difficulty finding someone interested in taking it over. The FHLBB shopped St. Bernard to 19 Louisiana institutions and only one institution other than Dixie requested a bid package. St. Bernard was well capitalized by Dixie's donation of assets in 1986, but the only benefit to the Government legally was that it did not have to liquidate St. Bernard. The benefit to Dixie was that its assets were marked-to-market rather than carried on the books of St. Bernard at historical cost. It was in Dixie's interest to transfer as much as it

---

10. *Far West* has been cited often and argued by the parties. However, in that case the parties did not dispute the amount of money that the investors contributed to keep the bank afloat. The amount of the contribution was $26.6 million and that is the amount that the trial court awarded in its discretion. The proper measure of restitution depends on the particular circumstances of a given case. It is within the trial court's discretion to determine the measure of restitution that justice requires. *Far West Federal Bank v. Office of Thrift Supervision,* 119 F.3d 1358, 1367 (9th Cir.1997).

11. *See CalFed I,* 39 Fed.Cl. at 759 (Landmark contributed assets totaling $715 million). FDIC is claiming $641.9 million, which approximates the net value of assets contributed.

could to St. Bernard. The Government on the other hand needed only a willing purchaser to fill in the net deficit of $17.7 million.

The benefit to the Government was $17.7 million. To restore Dixie to its pre-contract status quo and disgorge the Government of the benefits it received by its breach, we must award the FDIC $17.7 million. The remainder claimed by FDIC was permitted but not required by the arrangement between Dixie and the regulators. FDIC did not claim reliance damages, so we do not address that issue.

### B. 1982 Goodwill Claim

 FDIC also seeks recovery of the value of the supervisory goodwill that the Government promised to Dixie pursuant to the 1982 Assistance Agreement, then breached by passage of FIRREA. FDIC claims that FIRREA deprived Dixie of the value of the Government's promise that it could use goodwill as capital for a period of time. It wants the dollar value of this lost promise.

The 1982 Assistance Agreement allowed Dixie to keep $101 million of supervisory goodwill on its books as capital. Without the goodwill, Dixie would have been insolvent even with the $20 million capital infusion from Landmark. FDIC's goodwill expert was Professor Cornell. He emphasized that regulatory goodwill had value to the thrift. Specifically, it provided Dixie with the opportunity to leverage its capital and grow larger than it otherwise would have. It also served as a cushion against regulatory seizure at a time when Dixie was otherwise unable to meet its minimum capital requirements. Dixie kept its doors open and remained afloat by counting supervisory goodwill toward meeting regulatory capital requirements.

We have stated that goodwill is not a cost that should be reimbursed dollar for dollar. *See California Federal Bank v. United States*, 43 Fed.Cl. 445, 459 (1999) (*CalFed II* ). While goodwill may provide leverage to magnify gains (or losses) from lending operations, it cannot protect a thrift against actual losses as capital does. Goodwill had the appearance of capital on the books of these failing institutions, but it was not real capital. The Government argued that the goodwill was merely an accounting fiction for which no damages should accrue. The Supreme Court in *Winstar* agreed that goodwill is an accounting fiction, but found that it had value nonetheless. *See* 518 U.S. at 854–55, 116 S.Ct. 2432. In *CalFed II* we did not rule that damages for lost goodwill are never appropriate, but rather that we could find no clear cash equivalent in that case. *See* 43 Fed.Cl. at 460. Our best estimate of damages in that case was the cost of replacing the goodwill with real capital. *See id.*

Professor Cornell developed a model for valuing goodwill based on the cost to a private institution of replicating a government guaranty. The model assumes the sale of preferred stock and places the proceeds from such stock in treasury securities. These proceeds are a substitute value for supervisory goodwill. The cost of replicating this guaranty is the difference between the cost of raising the preferred stock and the income earned on the treasury securities. The transaction costs in Professor Cornell's view would amount to five percent of the value of the amount of the preferred stock raised. Professor Cornell concluded that the value of supervisory goodwill was equal to $39.9 million at the date of contract or $32.3 million at the time of breach.

FIRREA required that the thrifts phase out $2,525,000 of goodwill each year. The remainder stayed on the books of the institution. Dixie had the use of the goodwill for 8 years. We cannot award FDIC damages for goodwill measured from the date of contract when it availed itself of the benefits of the goodwill for those years prior to the breach. Beginning in 1989 it had to phase out the goodwill. This is when damages started to accrue, when the thrift lost its bargained for right.

The question is, what damages began to accrue then, if any. FDIC argues that goodwill has value in part because it kept Dixie's doors open after the 1982 Agreement. Without goodwill, Dixie would have failed even with the $20 million plus infusion of cash and property from Landmark, according to FDIC. This is true. But the fact is, Dixie did have use of goodwill accounting in 1982

and it did keep its doors open as a result. Professor Cornell testified that supervisory goodwill was needed to rebuild Dixie's capital base "during the interim period" in hopes of restoring the thrift to long-term profitability. The interim period he is referring to is the period 1982–1989. So that is not the value of goodwill that we are seeking to quantify. Dixie used its goodwill from 1982 until the breach in 1989. Even then, it was permitted to phase out the goodwill over a period of years.

We did not have testimony at trial that established the cost to Dixie of phasing out its goodwill prior to its failure in 1990. No one argued that loss of goodwill caused Dixie to fail. We heard testimony concerning the effect that phasing out its real estate investment had on Landmark. We heard testimony about Landmark's attempts to sell assets in the form of real estate and how those efforts allegedly were thwarted by the regulators. But we do not know from the record the effect of loss of goodwill after the breach.

We found Professor Cornell's model to be more persuasive than others that we have heard used in similar cases before this court. But his costs are theoretical as applied to the facts here. They provide a measure of damages that Dixie might have incurred had it chosen to replace the goodwill that was phased out according to the requirements of FIRREA. This did not happen though. Dixie failed within two years of the breach in 1989. Professor Cornell measures an expense that Dixie might have incurred had it not failed before that could happen.

Defendant cites *CalFed II* frequently as establishing the proper measure for valuing lost goodwill. The Court of Appeals for the Federal Circuit eventually will decide whether the *CalFed* model is appropriate, but then only in the context of those facts. This case is different from *CalFed* in many respects. For example, CalFed survived the breach and became a profitable institution. The damage award in that case was an effort to reimburse CalFed for the cost it actually incurred in replacing its lost goodwill accounting. Dixie failed within two years of the breach. We do not know from the record that it failed because of the required goodwill phase-out. Most of Professor Cornell's testimony is in the subjunctive, so we assume that Dixie never attempted to replace it's lost goodwill as CalFed did. In these circumstances, even the $4.1 million flotation costs that the parties agree *would have* applied to raising sufficient capital to replace goodwill seem inappropriate as a measure of damages.

### III. Government's Case

#### A. Fraud

Defendant contended that Landmark's claims for recovery were forfeited pursuant to 28 U.S.C. § 2514 because it had committed several acts of fraud. These are Thrift Financial Report Fraud (TFR), PGA West Fraud, and the Floyd Report Fraud. As these claims potentially were dispositive, we spent three weeks determining the merits of defendant's counterclaim asserting special plea in fraud prior to beginning plaintiff's case-in-chief.

Title 28 of United States Code § 2514 states:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof. In such cases the United States Court of Federal Claims shall specifically find fraud or attempt and render judgment of forfeiture.

To prevail on its counterclaim, the United States must prove: "(1) misrepresentation of a material fact; (2) intent to deceive or a reckless state of mind; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived through reliance." *BMY–Combat Sys. v. United States*, 38 Fed.Cl. 109, 128 (1997) (citing *Colorado State Bank v. United States*, 18 Cl.Ct. 611, 629 (1989), *aff'd* 904 F.2d 45, 1990 WL 62180 (Fed.Cir.1990)). The special plea in fraud requires proof by clear and convincing evidence. *Id.*

The first instance of alleged fraud addressed Oak Tree's Thrift Financial Reports. Thrifts are required to submit periodic thrift financial reports to the Office of Thrift Supervision. The reports provide regulators

with information regarding an institution's overall health. Defendant contends that between 1986 and 1991 Landmark's management represented on these reports that loans among the thrifts and subsidiaries were secured, when in fact the mortgages securing these loans were not recorded. The security interests were unperfected. In October 1991 the subsidiaries filed for bankruptcy. In the bankruptcy filings, the loans were reported as unsecured. Defendant argues that had the regulators known that the loans were unsecured, they would have required Oak Tree to secure the debt.

Secondly, defendant asserts that Landmark and the thrifts engaged in a fraudulent profit recognition scheme from November 1988 through January 1989 involving a transaction that resulted in a material overstatement of Oak Tree's regulatory net worth. Specifically, in December 1988 Oak Tree sold 56 acres of undeveloped land to PGA West Associates Limited Partnership for $39,500,000.

PGA West Associates was a limited partnership affiliate of Capital Realty Investment, Inc. (CRI). In December 1987 CRI wrote Landmark proposing that Landmark invest $30 million in CRI. CRI also proposed to purchase the PGA West site from Landmark. These transactions were approved. Defendant argues that the sales price to CRI was "manufactured by CRI and Landmark depending what Landmark needs to show as a profit." More importantly, defendant contends that Landmark violated the principles of Financial Accounting Standard 66 which prohibits the full recognition of profit from the sale of real estate where the initial investment made by the buyer has been loaned, refunded, or directly or indirectly provided to the seller by the buyer. This is the fraud of which defendant complains.

Lastly, defendant contends that in November 1989 Oak Tree hired Floyd and Associates to perform an asset quality review. Floyd and Associates performed a review of Oak Tree's loan portfolio and loan classifications. Floyd recommended that many of the classified loans be listed as substandard and doubtful. The report of Floyd and Associates was not given to the regulators. Defen-

dant argues that Oak Tree and Landmark concealed important and damaging loan classification and reserve loss information from federal regulators and its independent auditors, Price Waterhouse. If the regulators had been aware of the Floyd findings, defendant contends that they would have required Oak Tree to set aside an additional $160 million in loan loss reserves. Oak Tree committed fraud by failing to disclose this report to the regulators, according to defendant.

### 1. The Alleged Thrift Financial Report Fraud (TFR)

When Oak Tree loaned funds to the subsidiaries, it executed promissory notes memorializing the debt. These notes were secured by deeds of trust, mortgages, and assignments of deeds of trust. The documents were not recorded in the official public lien records. Plaintiff reported these loans on the TFR in Section F, Line 430 labeled, "Conforming (Secured) Loans to Service Corporations/Subsidiaries." The TFR instructions do not make a distinction between recorded and unrecorded mortgages. While FHLBB Resident Examiner, Greg Goggans considered the practice of not recording the mortgages to be an unsafe and unsound practice, he testified that he was not aware of any instructions which states that unfiled mortgages should not be reported as a mortgage. Even if Landmark reported the mortgages incorrectly, Mr. Goggans testified that it did not rise to the level of fraud.

### 2. The PGA West Transaction

The thrifts contacted Price Waterhouse regarding the proper accounting treatment for the PGA West sale. Price Waterhouse concluded that full accrual profit recognition was appropriate. Regulators required reversal of the profit recognition and Oak Tree restated its financial statements. The Securities Exchange Commission reviewed the transaction during an investigation in 1990. The SEC did not require Landmark to reverse the PGA West profit recognition. Landmark complied with the regulators' mandate. It's actions with regard to this transaction do not amount to fraud.

### 3. The Asset Quality Review

Floyd and Associates reviewed loan files at Oak Tree and made recommendations concerning loan classification. The resident examiner, Greg Goggans testified that he was aware that Floyd and Associates was providing services to Oak Tree regarding its loans. Mr. Odom, Oak Tree's Senior Vice President and Chief Lending Officer testified that he recalled discussing the Floyd work with Mr. Goggans. Mr. Odom stated that he did not recall anyone trying to hide the Floyd report from regulators. Moreover, with or without the Floyd Report, examiners conducted their own examination on the quality of the thrifts loan portfolio. Mr. Goggans testified, "we would have utilized the Floyd report for whatever insight it might offer us." Furthermore, Oak Tree Savings Bank management made its own classifications regarding the loans. As a member of the asset review committee, Mr. Odom testified that Oak Tree's classifications were good work.

We dismissed defendant's fraud claims at the end of its case for the reasons stated herein and on the record of trial. Defendant did not prove that Landmark committed fraud by clear and convincing evidence, or even by a lesser standard. It was not clear to us why the Government brought fraud charges on the facts of this case, when they had so little merit and caused substantial delay in beginning plaintiffs' case-in-chief.

### B. Affirmative Defenses

#### 1. Mitigation

■ Defendant argued at trial that neither Landmark nor Oak Tree took steps to mitigate the consequences of FIRREA. Specifically, it alleged that Landmark failed to invest capital to prevent the failure of Oak Tree. According to defendant, Landmark and Oak Tree's failure to sell real estate is a bar to plaintiffs' damage claims.

FIRREA required that impermissible investments be phased out and ultimately eliminated for purposes of meeting regulatory capital requirements. *See* 12 U.S.C. § 1464(t). Landmark and Oak Tree pursued efforts to liquidate the property development assets in order to meet FIRREA's capital requirements. Landmark attempted to sell its real estate assets in bulk. Negotiations with the General Motors Pension Plan began in late 1989. Landmark retained Kenneth Leventhal & Co., to prepare cash flow studies of its properties. When negotiations with General Motors fell through, Landmark focused on a sale to Mr. Barry Hon, a California developer. Mr. Hon was ready, willing and able to consummate a deal with Landmark. But in May 1990, the regulators rejected the Hon deal. Mr. Hon testified that Landmark and Oak Tree did all that they could to try to sell him the real estate.

Oak Tree hired Salomon Brothers in June 1990 to assist in marketing the properties and in December of that year conducted negotiations with Daiichi Real Estate Company for the sale of some assets. The sale was never consummated, however. Mr. Byron Mills, President and Chief Executive Officer of Oak Tree Savings Bank in 1991 testified that there were several reasons that the Daiichi sale did not close. He testified that Daiichi investors became disenchanted with the deal because it was such a "long, drawn-out affair." In his opinion, Daiichi was concerned about the amount of involvement that the government regulators had. The financial situation in Japan was deteriorating. All of these factors contributed to the failure of the parties to close the deal.

Section 350 of the Restatement (Second) of Contracts provides:

(1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation.

(2) The injured party is not precluded from recovery by the rule stated in Subsection (1) to the extent that he has made reasonable but unsuccessful efforts to avoid loss.

Landmark and Oak Tree took significant steps to comply with the requirements of FIRREA. Oak Tree made business decisions that it felt were in the best interests of the thrift. While its efforts proved unsuccessful, plaintiff made proper attempts to mitigate the impacts of FIRREA.

## 2. Prior Material Breach

█ Defendant contends that Landmark materially breached the contract prior to the enactment of FIRREA. According to defendant, Landmark mismanaged the thrifts and allowed capital levels to fall below required levels. Hence, defendant argues that its actions are excusable.

Oak Tree Savings bank had positive GAAP capital of $243,127,000 as of December 31, 1989. This was the amount reported in Oak Tree's audited financial statements. OTS also determined that Oak Tree Savings had positive capital of $265,410,000 in January 1990.

Mr. Roberts was an expert for the Government who testified that in his opinion all of plaintiffs' evidence concerning Oak Tree's capital was incorrect. This evidence included opinions from Price Waterhouse, the Office of Thrift Supervision, and the Federal Deposit Insurance Corporation. This was not credible testimony. Oak Tree Savings was well capitalized in December 1989. In March 1989 the FHLB of Dallas felt that both Oak Tree Savings Bank's and Landmark Savings Bank's health was good. The Government's breach occurred in August 1989. Before then, the thrifts were in capital compliance. We found no competent evidence that Landmark or the thrifts committed a prior material breach.

## 3. Unclean Hands

According to the Government, Landmark comes to this court with unclean hands. Specifically, defendant argues that Landmark may not recover restitution in this case because Landmark engaged in sham transactions and circumvented the requirements of the Assistance Agreement when it donated the properties to Dixie in 1983.

Defendant did not present persuasive evidence that Landmark or the thrifts come to this court with unclean hands. In fact, it did not present a coherent legal or equitable theory of how or why the doctrine of unclean hands might apply in a case of this nature. Moreover, we have ruled that the 1983 contribution was not covered by the Assistance Agreement and Landmark may not recover under either restitution or reliance. Hence,

we see no need to address this issue further. Many cases similar to this one are waiting in the wings. We urge the Government to consider its defenses very carefully and not raise fanciful theories in the apparent hope that one of them might stick.

## C. Offsetting Benefits

█ Defendant contends that even if Landmark conferred a benefit on the Government, that benefit was offset by the $2.1 billion deficit that the Government paid when Oak Tree was seized by the regulators. Restitution requires that the nonbreaching party return any benefits received by the breaching party. Defendant thus asserts that under restitution principles there is nothing for it to restore.

We cannot see what benefits plaintiff received from the Government's paying off the receivership deficit of $2.1 billion. Landmark obtained an operating thrift when it contracted with the United States in 1982. It operated the thrift, contributed capital, and managed it in a safe and sound manner. At the time of the Government's breach, the thrift was solvent. Oak Tree began to deteriorate in December 1989. FIRREA disallowed the use of goodwill toward tangible capital calculations. Oak Tree's investments in real estate subsidiaries were eliminated from capital calculations. Specifically, a 10% reduction occurred in 1990 and 25% reduction on July 1, 1991. Also, OTS prohibited Oak Tree from further investments or expenditures in real estate without regulatory approval in November 1989. In July 1990 the regulators informed Oak Tree that "[a]s a result of the ten percent deduction for the institution's investment in [the Subsidiaries] ... Oak Tree now fails all three regulatory capital requirements ...." Oak Tree then was subject to greater restrictions on making new loans or investments.

There may be many reasons why the deficit rose to $2.1 billion by the time of liquidation. Some of the reasons are chargeable to the Government. Once the breach occurred, plaintiffs were forced to proceed in a new business environment; one where property development by the thrift was severely restricted, if not eliminated. Defendant did not present convincing evidence at trial that

the $2.1 billion deficit was a benefit to the plaintiff. We cannot use that deficit to offset Landmark's restitution claim.

## CONCLUSION

Simply put, restitution is an equitable remedy whereby the breaching party must return any value that it has received from the contract. Reliance is a damage remedy that reimburses the non-breaching party for expenses that it incurred in connection with its performance under the contract. Presumably, restitution would be sought more often when the contract has been wholly or partly completed; reliance damages may apply where a party breaches before most of the work is completed.

In this case, Landmark's $21,458,571 million contribution pursuant to the 1982 Agreement could be viewed either as restitution or reliance. As restitution, we would return or "disgorge" the benefit that defendant obtained from plaintiff's participation in the Agreement. As reliance damages, we would reimburse Landmark for the money that it contributed in accordance with the terms of the contract that defendant breached. It happens that the two theories produce the same award to Landmark: $21,458,571 million.

Oak Tree Savings and Loan is represented by FDIC in this proceeding because it took over the institution as receiver when Oak Tree failed after the breach. FDIC's claim for lost goodwill is similar to those of other cases that have been litigated in this court, including *Winstar* itself. We note that FDIC's expert offered a more reasonable basis for the court to estimate the value of goodwill to a financial institution, a concept that otherwise seems not to be an asset at all. He did not attempt to argue that goodwill has a value that is equivalent to capital on a dollar-for-dollar basis.

FDIC's other claim is for the value of Dixie's contribution to St. Bernard to keep that institution from failing. Dixie contributed over $700 million ($641.9 million net), but we cannot say that this amount is the benefit conferred on the Government for restitution purposes. Dixie chose to make that contribution, and no doubt the regulators did not object. But the amount that the Government needed to make St. Bernard solvent was $17.7 million. This is the amount that the Government insurance fund would have paid out to depositors absent Dixie's investment. So we believe that the benefit conferred was $17.7 million. No additional amounts were required by any documents that make up the contract to take over St. Bernard. Presumably, Dixie was interested in contributing much more than necessary to St. Bernard because the assets contributed enjoyed favorable accounting treatment on St. Bernard's books as part of the consideration offered by the regulators to Dixie. While FDIC makes persuasive arguments for return of the entire $641.9 million, it does not seem appropriate to require the Government to underwrite a business decision on Dixie's part that did not work out as planned.

The Clerk will enter judgment for plaintiff Landmark in the amount of $21,458,571, and for plaintiff FDIC in the amount of $17.7 million. Costs to plaintiffs.