Hui Malama I KOHOLA,
et al., Plaintiffs,

v.

NATIONAL MARINE FISHERIES
SERVICE, et al., Defendants,

and

Hawaii Longline Association,
Intervenor.

No. CIV.0300633SPK/BMK.

United States District Court,
D. Hawai'i.

April 13, 2004.

---

David L. Henkin, Esq., Earthjustice Legal Defense Fund, Honolulu, HI, for Plaintiffs.

Keith Rizzardi, Esq., United States Department of Justice, Environment & Natural Resources Division, Wildlife & Marine Resources Section, Washington, DC, Theodore G. Meeker, Esq., Assistant United States Attorney, Honolulu, HI, for Defendants.

Laurie K. Beale, Esq., Jeffrey W. Leppo, Esq., Stoel Rives LLP, Seattle, WA, George W. Brandt, Esq., Steven Y. Otaguro, Esq., Lyons Brandt Cook & Hiramatsu, Honolulu, HI, for Intervenor.

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' AND INTERVENOR'S MOTIONS FOR SUMMARY JUDGMENT

SAMUEL P. KING, District Judge.

### OVERVIEW

This suit involves the cetacean "false killer whale" (*pseudorca crassidens*), Hawaii commercial longline fishing operations, and the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 et seq. ("MMPA"). False killer whales are sometimes—recent data indicates around anywhere from 4 to 9 per year—caught in longlines used to capture tuna and swordfish. The underlying question is whether this is too many for the 2003 List of Fisheries classification under the MMPA.

The National Marine Fisheries Service ("NMFS" or "Service") has classified the Hawaii longline fishery as a "category III" fishery for purposes of the MMPA since at least 1994. (The first reported false killer whale interaction was in 1997.) Categories I and II have significant registration, monitoring, reporting, and other requirements, while category III does not. For the past few years, the Pacific Scientific Review Group recommended changing the classification from category III to either category I or II. For 2003, the NMFS left the classification at III. Plaintiffs contend that the refusal to change the classification was illegal. By this suit, they seek an order declaring as such and requiring a proper reclassification in the next few months.[1]

---

1. In their initial motion, Plaintiffs asked for such a reclassification within 30 days; in their reply, they state that it would be sufficient to order a reclassification by June 30, 2004.

Plaintiffs rely on the "annual mortality rate" of false killer whales. If the annual mortality rate exceeds 50% of the "potential biological removal level" ("PBR") then the fishery meets a regulatory definition of a category I fishery. In turn, the PBR is a function of the "minimum population size." Data from the 1990's indicates an estimated minimum population size of 83 false killer whales. This leads to a PBR of 0.83. A PBR of 0.83 means that catching any more than 0.4 false killer whales per year would place the fishery into category I. Even one mammal every other year would be too high. The main complication here is that no one really knows what the population of false killer whales is in the relevant area. Under the formula, if the population estimate is artificially low then the PBR would be artificially low, leading to an artificially low mortality rate, and possibly an improper classification for the fishery.

The data was inadequate. No one really disputes this.[2] The estimates from the 1990's were taken from aerial surveys, with various uncertainties in that method not taken into account, and only within 25 nautical miles of the Hawaiian Islands. What's more, the Hawaiian longline fishery cannot fish within that surveyed area. Given that the PBR is based on inadequate data, the NMFS and Intervenor Hawaii Longline Association ("HLA" or "Association") contend that the NMFS had the discretion to leave the classification at category III for 2003. They also argue that the Court should give deference to the Service's interpretation of any ambiguity in the regulations. *See Chevron U.S.A.,*

*Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (reasoning that an agency's interpretation of its regulations is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation).

Notably, new surveys were conducted in 2002 but the data could not be incorporated in time for the 2003 classification. The 2003 classification specifically noted as such and indicated that the new data would be incorporated into future classifications. The 2004 classification, incorporating the new data, has begun with a draft release sent to the Federal Register on April 12, 2004. With a statutorily-required notice and comment period, the final classification for 2004 is due near the end of June. Thus, the Service and the Association both emphasize that this suit is "prudentially moot." *See Chamber of Commerce v. U.S. Dep't of Energy,* 627 F.2d 289, 291 (D.C.Cir.1980). The primary relief Plaintiffs seek will occur regardless of this suit.

For the reasons set forth, the Court DENIES the Plaintiffs' motion and GRANTS the Defendants' motion. The Service's decision to leave the Hawaii Longline Fishery at category III for 2003 and not to recategorize to category I or II was not arbitrary or capricious and did not violate the Administrative Procedures Act. And, in any event, the suit will soon be moot, at least as far as a reclassification remedy is sought.

2. NMFS Stock Assessment Reports have consistently and specifically stated that the population estimates are low. They state "This abundance underestimates the total number of false killer whales within the U.S. EEZ off Hawaii, because areas around the Northwest Hawaiian Islands (NWHI) and beyond 25 nautical miles from the main islands were not surveyed and estimates are uncorrected for the proportion of diving animals missed from the survey aircraft." [AR 1254, 1548]. "As with the best abundance estimate..., [the minimum population estimate of 83] includes only areas within about 25 nmi of the main Hawaiian Islands and is therefore an underestimate." [AR 1254, 1548].

## BACKGROUND

### 1. Classification of Commercial Fisheries.

Under the MMPA, the Service is required to classify commercial fisheries, and revise the list at least once a year, to implement a goal of regulating the "taking"[3] of marine mammals. 16 U.S.C. § 1387(c)(1)(C). The statute classifies fisheries into one of three categories: category I is a commercial fishery that has *"frequent* incidental mortality and serious injury of marine mammals;"* category II has *"occasional* incidental mortality and serious injury of marine mammals;"* and category III has "a *remote* likelihood of or no known incidental mortality or serious injury of marine mammals." 16 U.S.C. § 1387(c)(1)(A)(i)-(iii) (emphases added).

Category III fisheries are largely unregulated—under the MMPA[4]—while categories I and II are subject to several MMPA regulatory requirements. Vessels must register for and display "certificates of authorization." *See* 16 U.S.C. § 1387(c); 50 C.F.R. § 229.4. The Service can require vessels to carry "on-board observers" and vessels must self-report any interactions with marine mammals. *See* 16 U.S.C. §§ 1837(c)-(e); 50 C.F.R. §§ 229.4, 229.6-.7. The Service may also require establishment of "take reduction teams" ("TRTs") and development of formal "take reduction plans" ("TRPs") as well as corresponding implementing regulations. *See* 16 U.S.C. §§ 1387(f)(1)-(11). (The parties appear to dispute whether the TRTs and TRPs are discretionary or mandatory, but this has no bearing on the present suit.)

In turn, the Service has promulgated regulations. The regulations further define the categories of fisheries. Under 50 C.F.R. § 229.2, a category I fishery:

> means a commercial fishery determined by the Assistant Administrator to have frequent incidental mortality and serious injury of marine mammals. *A commercial fishery that frequently causes mortality or serious injury of marine mammals is one that is by itself responsible for the annual removal of 50 percent or more of any stock's potential biological removal level.* (Emphasis added).

Plaintiffs' case depends almost entirely on the emphasized portion of this regulation. Because the numbers in the Service's current "Stock Assessment Report" (compiled pursuant to 16 U.S.C. § 1386) indicate that the fishery's mortality rate is 50 percent more than the false killer whale's PBR, the Plaintiffs argue that the fishery necessarily is a category I fishery.

In contrast, under the regulations, a category II fishery

> means a commercial fishery determined by the Assistant Administrator to have occasional incidental mortality and serious injury of marine mammals. A commercial fishery that occasionally causes mortality or serious injury of marine mammals is one that, collectively with other fisheries, is responsible for the annual removal of more than 10 percent of any marine mammal stock's potential biological removal level and that is by itself responsible for the annual removal of between 1 and 50 percent, exclusive, of any stock's potential biological removal level. *In the absence of reliable infor-*

---

**3.** Under Title 16 U.S.C. § 1362(13) the term "take" means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal.

**4.** The Service and the Association emphasize that Hawaii's longline fishery is otherwise subject to much regulation under the Endangered Species Act (16 U.S.C. § 1801 et seq.) and the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. § 1531 et seq.).

mation indicating the frequency of incidental mortality and serious injury of marine mammals by a commercial fishery, the Assistant Administrator will determine whether the incidental serious injury and mortality is "occasional" by evaluating other factors such as fishing techniques, gear used, methods used to deter marine mammals, target species, seasons and areas fished, qualitative data from logbooks or fisher reports, stranding data, and the species and distribution of marine mammals in the area, or at the discretion of the Assistant Administrator. Eligible commercial fisheries not specifically identified in the list of fisheries are deemed to be Category II fisheries until the next list of fisheries is published. (Emphases added).

Likewise, the regulations describe a Category III fishery as

a commercial fishery determined by the Assistant Administrator to have a remote likelihood of, or no known incidental mortality and serious injury of marine mammals. A commercial fishery that has a remote likelihood of causing incidental mortality and serious injury of marine mammals is one that collectively with other fisheries is responsible for the annual removal of: (1) Ten percent or less of any marine mammal stock's potential biological removal level, or (2) More than 10 percent of any marine mammal stock's potential biological removal level, yet that fishery by itself is responsible for the annual removal of 1 percent or less of that stock's potential biological removal level. In the absence of reliable information indicating the frequency of incidental mortality and

serious injury of marine mammals by a commercial fishery, the Assistant Administrator will determine whether the incidental serious injury or mortality is "remote" by evaluating other factors such as fishing techniques, gear used, methods used to deter marine mammals, target species, seasons and areas fished, qualitative data from logbooks or fisher reports, stranding data, and the species and distribution of marine mammals in the area or at the discretion of the Assistant Administrator. (Emphases added).

50 C.F.R. § 229.2.

The reexamination of fishery classifications must be done "at least once each year [after April 30, 1994], and at such other times as the Secretary [of Commerce, i.e., the NMFS] considers appropriate, reexamine, based on information gathered under this chapter and other relevant sources and after notice and opportunity for public comment[.]" 16 U.S.C. § 1387(c)(1)(C) (emphasis added).

2. Stock Assessment Reports.

One of the sources of information used to classify fisheries are "Stock Assessment Reports" or "SARs." See 16 U.S.C. § 1386. The MMPA requires the SARs to be based upon the "best scientific information available." See id. § 1386(a) and § 1386(b)(3). The Service is also to consider advice from regional scientific review groups (in this case, the Pacific Scientific Review Group or "PSRG") in making its classification decision.[5] The SARs contain a host of information including population estimates of marine mammals, estimates of human-caused mortality and serious injury, and

---

**5.** Section 1386(b)(3) provides in pertinent part:

After consideration of the best scientific information available, the advice of the appropriate regional scientific review group established under subsection (d) of this section, and the comments of the general public, the Secretary shall publish in the Federal Register a notice of availability and a summary of the final stock assessment or any revision thereof[.]

estimates of potential biological removal levels. *See id.* § 1386(a)(1)-(6).

### 3. Classification history.

Here, the PSRG has recommended changing the fishery classification from category III to category I or II since 1998 (even before the current PBR was calculated). The Intervenor HLA asserts that the recommendation was initially based upon the PSRG's "colloquial" use of the terms "remote" and "occasional" taking of false killer whales, and not on hard numbers. In any event, however, the PSRG did recommend changing the fishery classification to level I for the relevant 2003 classification and that recommendation was apparently based, at least in significant part, on the current (2003) PBR.

To repeat, the current (2003) PBR is 0.83. The number is based upon a "minimum population estimate" of 83 false killer whales. The minimum population estimate is derived from an "abundance estimate" of 121, which was calculated from a study of combined aerial survey data in 1993, 1995, and 1998. The minimum population estimate [6] represents the "log-normal 20th percentile of the combined 1993–1998 abundance estimate." [AR 1548]. The PBR is the "product of the following factors: (A) The minimum population estimate of the stock[,] (B) One-half the maximum theoretical or estimated net productivity rate of the stock at a small population size[,] and (C) A

recovery factor of between 0.1 and 1.0 [in this case 0.4]." *Id.* § 1362(20).

As noted earlier, there is no real dispute that these numbers were underestimates. The SARs have consistently and specifically stated that the population estimates are low. They state

This abundance underestimates the total number of false killer whales within the U.S. EEZ off Hawaii, because areas around the Northwest Hawaiian Islands (NWHI) and beyond 25 nautical miles from the main islands were not surveyed and estimates are uncorrected for the proportion of diving animals missed from the survey aircraft. [AR 1254, 1548].

and

As with the best abundance estimate..., [the minimum population estimate of 83] includes only areas within about 25 nmi of the main Hawaiian Islands and is therefore an underestimate." [AR 1254, 1548].

The real question here is whether the Service had discretion to consider the reliability of the scientific data (which is, or was, the *only* available scientific data) in making its 2003 classification decision.

### 4. Standard of Review.

The Court reviews the Service's action here under an "arbitrary and capricious" standard under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A). "The function of the district court is to deter-

---

**6.** The MMPA defines "minimum population estimate" as

an estimate of the number of animals in a stock that—
(A) is based on the best available scientific information on abundance, incorporating the precision and variability associated with such information; and
(B) provides reasonable assurance that the stock size is equal to or greater than the estimate.

16 U.S.C. § 1362(27).

The Plaintiffs emphasize that the estimate must be based upon "best available scientific evidence" while the Service and the Association emphasize that it must "incorporate the precision and variability associated with such information" (i.e., its reliability) and that there must be "reasonable assurance" that the stock size is equal to or greater than the estimate.

mine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769–70 (9th Cir.1985).

Under this standard,

An agency's decision may only be called arbitrary and capricious if: the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1448 (9th Cir.1996) (citations omitted).

■ Deference to an agency's expertise and experience is particularly warranted where scientific matters are involved. *See Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993). If statutory questions are raised, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. The Service's interpretation of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (citations omitted).

### ANALYSIS

1. Plaintiffs have standing.

Initially, the Court finds that the three Plaintiffs—Hui Mālama I Koholā (an unincorporated association), Center for Biological Diversity, and Turtle Island Restoration Network—are all environmental protection organizations that have standing to bring this suit. The Court is satisfied that the declarations of members of each organization (attached to Plaintiffs' original motion filed on December 30, 2003) establish the necessary injury to individuals and their respective associations, especially where, as here, a "procedural standing" inquiry allows for relaxed causation and redressibility requirements. *See Laub v. U.S. Dep't of Interior,* 342 F.3d 1080, 1086–87 (9th Cir.2003) (setting forth relaxed standards for procedural standing); *Biodiversity Legal Foundation v. Badgley,* 309 F.3d 1166, 1171–72 (9th Cir.2002) (setting forth requirements for organizational standing). And, in any event, the Court is certainly satisfied that at least one of the Plaintiffs has standing. *See Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981) (noting that because one plaintiff had standing, the court need not consider the standing of the other plaintiffs).

2. The Service's 2003 classification decision was not arbitrary and capricious.

The Plaintiffs' position is that the wording of the regulation, 50 C.F.R. § 229.2, and its definition of "category I" leaves no room for any other classification.

■ The Plaintiffs' argument fails. Although category I is defined as "one that is by itself responsible for the annual removal of 50 percent or more of any stock's potential biological removal level," this regulatory definition should be read in conjunction with the definitions of category II and III. Categories II and III both contain qualifiers "in the absence of reliable information ... the [Service] will [evaluate] other factors such as fishing techniques, gear used, methods used to deter marine mammals, target species, seasons and areas fished, qualitative data from logbooks or fisher reports, stranding data, and the species and distribution of marine mammals in the area or at the

discretion of the [Service]" in determining whether the "frequency of incidental mortality or serious injury" is occasional or remote. Under the regulations, if the population data for the false killer whale is not "reliable" then the service will look to "other factors."

The Plaintiffs argue that the "plain language" of the regulatory definition of category I mandates a finding that the fishery is in fact a category I fishery. This "plain language" argument, however, cuts both ways. Given that the data is, or was, unreliable, the "plain language" of the regulatory definition of category III also gives the Service discretion to look to other factors and place the fishery in category III. That is, given the calculated PBR and the known limitations on the quality of existing data in 2003, the fishery could fall within the "plain language" of any of the three categories.

More importantly, the statute—not the regulations promulgated by the NMFS—indicates that the Secretary of Commerce (i.e., the NMFS) *shall* consider not only "information gathered under this chapter" (e.g., stock assessment reports) but also "other relevant sources . . . after notice and opportunity for public comment" in making commercial fishery classifications. 16 U.S.C. § 1387(c)(1)(C).

Again, under 50 C.F.R. 229.2, a category I fishery:

> means a commercial fishery determined by the Assistant Administrator to have frequent incidental mortality and serious injury of marine mammals. *A commercial fishery that frequently causes mortality or serious injury of marine mammals is one that is by itself responsible for the annual removal of 50 percent or more of any stock's potential biological removal level.* (Emphasis added).

The exclusion of an "in the absence of reliable information" clause from the category I regulatory definition—and the cor-

responding inclusion in categories II and III—could imply that the data necessary for a category I classification should itself be "reliable." *See* 60 Fed.Reg. at 31671 (June 16, 1995) ("This two-tiered approach [adopted in the regulations] assumes that NMFS has fairly accurate information on both the abundance of a stock (in order to calculate PBR) and the current level of incidental serious injury and mortality due to commercial fishing per year"). Such an interpretation by the Service of its own implementing regulations is not clearly erroneous or inconsistent with the regulations, and this Court is therefore bound to find the Service's interpretation to be controlling. *See Auer,* 519 U.S. at 461, 117 S.Ct. 905 (reiterating the deferential standard that Secretary's interpretation of own regulations is controlling unless plainly erroneous or inconsistent with the regulation).

The Plaintiffs argue that the Service failed to consider "best available scientific evidence" in making its classification. This argument also fails. The Service considered "best available scientific evidence" in making its Stock Assessment Report (which the MMPA requires under section 1396(a) and (b)(3)). It also considered the "best available scientific evidence" in making its "minimum population estimate" (which MMPA appears to require under section 1362(27)(A) & (B)—which also allow a consideration of the evidence's "precision and variability" and whether it has "reasonable assurance that the stock size is equal to or greater than the estimate").

But, in making the *classification* decision, the Service is allowed to consider not only the Stock Assessment Reports, but also "other relevant sources." *See* 16 U.S.C. § 1387(c)(1)(C). In essence, it did in fact consider the "best available scientific evidence" in making its decision because it considered the SARs, although it

also considered other sources including known limitations of the reliability of the existing data and that new emerging data would be included in the 2004 classification. The Service's decision to classify the fishery as either II or III is certainly discretionary. 50 C.F.R. § 229.2 (definitions of categories II and III). *See also* 60 Fed.Reg. at 31671 (stating that categorization requires fairly accurate information), 66 Fed.Reg. at 42788 (same). This is a "permissible" reading of the regulations and, under *Chevron*, the Court gives deference to the Service's reading. The Court concludes that the 2003 classification decision was not arbitrary and capricious. The evidence in the administrative record permitted the Service to make the decision it did. *Occidental Eng'g Co.*, 753 F.2d at 769–70.

In any event, the primary relief sought by Plaintiffs (reclassification) will soon be moot. The 2003 decision was based, in part, on the inclusion of new data that could not (or was not) included in time for the 2003 classification. The 2004 decision will be based upon, in part, the new data. Although the suit is not yet moot, a reclassification will soon occur. Given a ruling for the Defendants on the merits, however, the Court need not decide whether to stay proceedings based upon a "prudential mootness" rationale.

## CONCLUSION

The Court DENIES the Plaintiffs' motion for summary judgment and GRANTS the Defendants' and Intervenor's cross-motions for summary judgment.

IT IS SO ORDERED.